JOHN O'BRIEN et al., Appellants, v. THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, Respondent.

The circumstances existing at the time of, and which led to the passage of a statute may be taken into consideration in giving to it a construction.

So, also, such circumstances may be considered in construing the provisions of a contract.

A contract between the parties for the construction by plaintiffs of a section of the work authorized by the act of 1883 (Chap. 490, Laws of 1883), to furnish the city of New York with an increased supply of water, contained provisions for "tunnel excavation" in substance as follows: "The form and area of the cross section of the tunnel excavation at any place shall be such as the engineer may determine for that place." It was stated that "various forms of cross sections" were illustrated on certain designated sheets of the plans annexed to the contract, and the line on the plans "limiting the cross section of the tunnel excavation," as designated therein by letters was pointed out. It was provided "that the tunnel at any place is to be excavated to the line of the cross section determined by the engineer for that place," and that "no payment shall be made for any excavation outside of the cross section," as so determined. It was subsequently provided that in case the contractors, through want of proper skill and care, excavated the tunnel to greater dimensions than was required for the proper building of the masonry, the excess of area thus formed should be filled in solid at their expense. In an action upon the contract it appeared that the line so designated upon the plans coincided with the exterior boundary line of the brick work of the tunnel. *Held*, that the said line was the true limit by which to measure the amount of excavation to be allowed the plaintiffs; that the meaning of the clause limiting payments to the line of the cross section determined as stated, was not affected by the subsequent provision, but the effect of the whole was that not only should the contractor receive in no case any pay for excavation outside the cross section line, but if an excess of excavation was caused by negligence or want of skill they should fill up the excess at their own expense; also, that the question was not affected by the facts that the contract provided for working plans to be thereafter furnished the contractors, and that the plans attached were designed to show the location of the work and its general character.

The contract provided for monthly estimates of work done and for payment thereon of ninety per cent of the estimated amount. It was stated, however, that such estimates were not required to be strictly accurate, but might be approximate only; and upon complete performance the engineer was to so certify in writing, stating in the certifi-

cate from actual measurements the whole amount of work done under and according to the terms of the contract. The contractors agreed to be bound by the action of the engineer, evidenced by his final certificate. It was also provided that "to prevent all disputes and litigation," the engineer should in all cases determine the quantity of the several kinds of work to be paid for, and should determine all questions relative to the execution of the work, and his estimate and conclusion should be final and conclusive upon the contractors, but that the city should not be precluded or estopped by any return or certificates given by the engineer from showing the correct amount and character of the work done. Plaintiffs made claim for an allowance for excavations outside of the said cross section line ; this was referred to the engineer, who, in his report thereon, gave his opinion that the contract provided for and permitted equitable cross sections beyond and in excess of the area required to be excavated for the tunnel and its lining. Subsequent to the making of this report, a few monthly payments were made upon the basis recommended thereby. This opinion was not concurred in by the aqueduct commissioners, and by resolution they required the engineer, in estimating quantities, to conform strictly to the requirements of the contract in the subsequent monthly estimates, and the final estimates limited the allowance for excavation to the external boundary line of the masonry. *Held*, that the city was not bound or precluded by the opinion of the engineer and the action under it; that he had no power or discretion to make allowances beyond the terms of the contract.

Plaintiffs claimed that they were at least entitled to retain the excess paid them under the monthly estimates made in accordance with the engineer's opinion. *Held*, untenable ; that the mistakes in those estimates simply resulted in crediting the contractors with more excavation than they were entitled to, which was properly corrected in making up the measurements for the final certificate.

Plaintiffs claimed that no proper final certificate was made by the engineer prior to the commencement of the action, but that the same was wrongfully withheld. *Held*, that, conceding there was such a withholding, the burden was upon plaintiffs to prove the amount due for excavation, and having been allowed all there was due, the withholding was immaterial.

The said act, after providing for the direction and supervision of the work by the engineer and other subordinates of the department of public works, provides (§ 30) that in no event shall the city be held in any action brought under any contract made pursuant to the act to any greater or other liability than that expressed in the contract, nor shall it be required to pay out any sum of money otherwise than in strict conformity with the terms of the contract. Plaintiffs claimed to recover as damages the alleged extra cost of work done, caused by erroneous grades, lines, etc., given them by the engineer of the commission. *Held*, that the action, so far as it sought to recover such extra cost, was an action

under the contract within the meaning of the act, and so that a recovery for such extra cost was prohibited; that the statute contemplated a liability on the part of the city to be specifically set forth in the contract, and that beyond its terms there should be no liability.

*Mulholland* v. *City of New York* (113 N. Y. 631); *People ex rel.* v. *Civil Service Boards of New York* (41 Hun, 287; 103 N. Y. 657), distinguished.

The complaint set forth a cause of action for work done under the direction of the engineer, not called for by the contract; it provided for extra work, making it a condition for the foundation of any claim therefor, that it must have been authorized in writing by the commissioners before its performance, and a certificate given that it was, in their opinion, for the public interest. The commissioners, claiming that certain work was not properly done, directed the work in question to be done to remedy the defect. *Held*, that plaintiffs were not entitled to recover therefor; that if the claim of the commissioners was erroneous, and the work was not required in order to substantially comply with the contract, it was extra work for which no recovery could be had, because of failure to comply with the provision.

*It seems* that if plaintiffs had substantially performed the contract their proper course was to have refused to do the extra work so required, and if a final certificate was refused when demanded, to have commenced their action, alleging such completion and the unreasonable withholding of the certificate.

Reported below, 65 Hun, 112.

(Argued February 28, 1893; decided November 28, 1893.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made June 29, 1892, which affirmed a judgment in favor of plaintiffs for $20,236.77 entered upon a verdict directed by the court.

This action was brought to recover money alleged to be due under a contract with defendant to construct section 6 of the new Croton aqueduct, authorized by chapter 490 of the Laws of 1883, and as damages the extra cost and expense of construction alleged to have been caused by the acts of the defendant.

The facts, so far as material, are stated in the opinion.

*Charles F. Tabor* for appellants. The Circuit Court refused, upon all of the evidence in the case, to allow the plaintiffs to go to the jury, but directed, upon the motion of

the defendant, a verdict for the sum admitted by the defendant to be due and unpaid upon the contract. This was error. (*Bagley* v. *Borne*, 105 N. Y. 179; *Bulger* v. *Rosa*, 119 id. 464.) The work intended to be provided for by the act of 1883 was a city work and must be held to be a work for city purposes. (*Pettengill* v. *City of Yonkers*, 116 N. Y. 565; *Bailey* v. *Mayor, etc.*, 3 Hill, 53; *People ex rel.* v. *Kelly*, 76 N. Y. 87.) The aqueduct commissioners and the engineers in the case represented the city of New York, and their acts must be regarded as the acts of the corporation. (*Swift* v. *Mayor, etc.*, 83 N. Y. 534; *Sage* v. *City of Brooklyn*, 89 id. 197; *Fleming* v. *Vil. of Suspension Bridge*, 92 id. 372; *Ehrgott* v. *Mayor, etc.*, 96 id. 273; *Bell* v. *Mayor, etc.*, 105 id. 139; *Mayor* v. *T. N. Bank*, 111 id. 455; *People ex rel.* v. *Board of Canvassers*, 129 id. 368; *People* v. *Batchellor*, 53 id. 140; *N. Y. & B. S. M. & L. Co.* v. *City of Brooklyn*, 71 id. 584; *Bailey* v. *Mayor, etc.*, 3 Hill, 531; *S. F. Society* v. *Phil.*, 31 Penn. St. 183, 189; *Scott* v. *City of Manchester*, 2 H. & N. 204; *Oliver* v. *City of Worcester*, 102 Mass. 499; *Board of Park Commissioners* v. *City of Detroit*, 28 Mich. 238; Dillon on Mun. Corp. §§ 66, 966; *Barnes* v. *District of Columbia*, 91 U. S. 540.) It is necessary, in considering the statute of 1883, that it should receive such a construction as will include all the authority to the commissioners and the engineers sufficient to enable them to accomplish the object to be attained. (*Mayor, etc.*, v. *Sand*, 105 N. Y. 218; *Baird* v. *Mayor, etc.*, 96 id. 601; *Woods* v. *Board of Supervisors*, 49 N. Y. S. R. 687.) The limitation contained in section 30 of the act of 1883 that "in no event shall the city of New York be held in any action or proceeding brought or had under any contract so made to any other or greater liability than that expressed therein, nor required to pay out or otherwise dispose of any sum of money for the doing of such work or the furnishing of such material, greater than is stipulated in such contract, nor otherwise than in strict conformity to the terms thereof," only makes the contract the measure of liability of the city. The

"work" claimed for here does not come within either of the exceptions of section 33 by reason of being over $1,000 or $5,000 in amount. The claim is for work done under the general contract made. (*Swift* v. *Mayor, etc.*, 83 N. Y. 537; *Gilmore* v. *City of Utica*, 131 id. 36; *People* v. *Stephens*, 71 id. 527.) In the absence of fraud or collusion, the acts of public officers acting on behalf of the authority conferred upon them, are the acts of the state and cannot be repudiated. There is no reason why the same rules should not apply to municipal corporations in an action involving the construction of a contract made under a statute between such a corporation and private individuals. (*Baird* v. *Mayor, etc.*, 96 N. Y. 593; *W. A. Co.* v. *Barlow*, 63 id. 70; *People ex rel.* v. *Mayor, etc.*, 65 id. 329.) Both the statute and the contract gave the engineer the power to give directions, and the plaintiffs were bound to follow them. They were, therefore, as well as the engineer, within the pale of the law. (*Mulholland* v. *Mayor, etc.*, 113 N. Y. 631; *Kingsley* v. *City of Brooklyn*, 78 id. 211; *People ex rel.* v. *Mayor, etc.*, 65 Hun, 326.) The engineer in charge was the agent of the city, both by statute and by contract. The conversations, therefore, had between the contractors and the engineer were admissible in evidence, and if admissible the jury had the right to give them such weight as they were entitled to for the purpose of establishing the changes which were necessarily made under the contract, as well as to all other matters in the line of their work, and within their power as engineers. (*Dwight* v. *Russell*, 133 N. Y. 307; *Scott* v. *M. R. R. Co.*, 86 id. 208.) The courts below have overlooked the rule which provides that "the practical construction put upon a contract by the parties to it is sometimes almost conclusive as to its meaning." (*Nicoll* v. *Sands*, 131 N. Y. 24.) To assent to the construction contended for by the court, "would make the contract unreasonable, and place the plaintiff entirely at the mercy of the defendant and the architect; such a construction should be avoided when the general scope of the instrument, and the terms used by the parties, fairly permit a more just and reasonable interpretation." (*Wright* v.

Reusens, 133 N. Y. 305; Osterhoudt v. Rigney, 98 id. 234; People ex rel. v. Preston, 131 id. 644; Elmendorf v. Herrin, 23 Wend. 632; McMahon v. N. Y. & E. R. R. Co., 20 N. Y. 465.) Plaintiffs were entitled under the contract to have the certificate made up from "actual measurements," and in such a case it would seem to be a reasonable construction of the contract to say that the certificate should so state. (McMahon v. N. Y. & E. R. R. Co., 20 N. Y. 465; Sweet v. Morrison, 116 id. 29.) The engineer was in the employ of the defendant, and the danger that the person acting as an arbitrator might favor his employer is obvious. (Sweet v. Morrison, 116 N. Y. 27.) If the changes and deviations from the contract, which were made from time to time by the engineers and commissioners, prevented the chief engineer from making a final certificate, according to the terms of the contract, showing the complete performance of the work, the defendant should be now estopped from raising the objection that the certificate given was final, or from insisting that the plaintiffs cannot recover because no proper final certificate was given. (Thomas v. Fleury, 26 N. Y. 34.) If the certificate is refused in bad faith or unreasonably, the plaintiff may recover upon proof of performance of the contract. (Doll v. Noble, 116 N. Y. 233; Thomas v. Stewart, 132 id. 586.) When it appeared that the work was completed as early as the 15th of April, 1890, if the defendant claimed that there was any reason why the certificate was delayed until about the time this action was brought, this certainly presents a question for the jury to pass upon and the court should not have non-suited. (B. N. Bank v. Mayor, etc., 63 N. Y. 340.) Proof of the performance of the contract will excuse the production of a certificate if it has been demanded. (Smith v. Wright, 4 Hun, 652.) While the contract authorized the aqueduct commissioners to reject the whole or any portion of the aforesaid work, should the certificate be found or known to be inconsistent with the terms of the agreement, and while there was to be no estoppel as against the city by reason of any certificate given showing the true and correct amount and

character of the work which shall have been done, the proofs show and it is conceded that the work was not only completed but accepted.   The defendant was, therefore, in no position to attack the certificate or to object to the want of a certificate, or to make any objection except to show on the trial, the true and correct amount and character of the work which shall have been done. (*Brady* v. *Mayor, etc.*, 132 N. Y. 429; *People ex rel.* v. *Mayor, etc.*, 65 Hun, 329; *Flaherty* v. *Miner*, 123 N. Y. 390; *Reilly* v. *City of Albany*, 112 id. 42; *Kip* v. *City of Buffalo*, 123 id. 152.)   The work having been admittedly completed, the failure of the engineer to give and the city to produce a proper certificate made up from actual measurements by the engineer acting upon his own judgment instead of that of the commissioners, clearly authorizes the court to hold that the certificate produced furnished no protection to the defendant. (*Young* v. *Hunter*, 6 N. Y. 207; *Thomas* v. *Stewart*, 132 id. 586; *County of Cook* v. *Harris*, 108 Ill. 162.)   A party to a contract can be estopped from exacting any provision thereof where the other party has relied upon the conduct and acts of the agent of the former, which agent possesses the power or has been held out to possess the power in respect to the provision aforesaid. (*Bishop* v. *A. Ins. Co.*, 130 N. Y. 488; *Burtis* v. *Thompson*, 42 id. 246; *Curnen* v. *Mayor, etc.*, 79 id. 514.)   The defendants are in no position now to claim that the release set up in the answer will operate as a bar to a recovery by the plaintiffs.   The release expressly excepts " any legal claims arising under the contract herein which have not been allowed by the aqueduct commissioners."   This did not release the city from the claims sued upon. (*Miller* v. *Coates*, 66 N. Y. 609; *Boardman* v. *Guillard*, 60 id. 614; *Moore* v. *Mayor, etc.*, 73 id. 240–251.)   If the engineer could not complete his certificate without consulting with the plaintiffs it was his duty to call upon them.   The failure of the engineer to include them in his certificate was error. (*Jones* v. *Wellwood*, 71 N. Y. 212; *Hiscock* v. *Harris*, 74 id. 113.)

*Robert G. Ingersoll* for appellants. In this case the certificate is not in accordance with the judgment of the engineer, and, therefore, was and is void. (*Strong* v. *Strong*, 9 Cush. 560; Morse on Arb. and Award, 107, 532, 534, 535, 539; *Bassett* v. *Harkness*, 9 N. H. 165; *Tracy* v. *Herrick*, 25 id. 394; *Bowen* v. *Steire*, 6 R. I. 251; *Perkins* v. *Giles*, 50 N. Y. 262; *Sweet* v. *Morrison*, 116 id. 27; *Kemp* v. *Rose*, 1 Giff. 258; *Conrad* v. *Ins. Co.*, 4 Allen, 20.)

*L. Laflin Kellogg* for appellants. The plaintiffs are entitled to recover for the tunnel excavation made by them under the terms of the contract at the contract price without the production of the final certificate as called for by the contract, upon the ground that after demand was made upon the engineer, who was the party named in the contract to make the certificate, and upon the aqueduct commissioners to accept the work, they wrongfully, unreasonably and in bad faith refused to make any certificate until after the commencement of this action. The questions of demand, unreasonable refusal and the amount of work done were questions which should have been submitted to the jury. (*Brehm* v. *Mayor, etc.*, 104 N. Y. 186; *Duryea* v. *Mayor, etc.*, 26 Hun, 120; *Dickinson* v. *Mayor, etc.*, 92 N. Y. 584; *B. N. Bank* v. *Mayor, etc.*, 63 id. 336; *Thomas* v. *Fleury*, 26 id. 26; *Nolan* v. *Whitney*, 88 id. 648; *Bryon* v. *Low*, 109 id. 295; *Smith* v. *Alker*, 102 id. 87; *Woodward* v. *Fuller*, 80 id. 312; *Beinhauer* v. *Gleason*, 15 N. Y. S. R. 231; *Sullivan* v. *N. Y. & R. C. Co.*, 119 N. Y. 348–355; *Mead* v. *Parker*, 111 id. 259–262; *Flaherty* v. *Miner*, 123 id. 382; *D. & H. C. Co.* v. *P. C. Co.*, 50 id. 250; *Bennett* v. *Bates*, 94 id. 354.) The plaintiffs were entitled to recover from the city of New York the increased cost of the work actually performed by the plaintiffs occasioned by erroneous grades, lines and centers given by the city's engineers and agents, and having shown a *prima facie* case, were entitled to have this question submitted to the jury. The court erred in dismissing the complaint upon this ground and refusing to submit the question to the

jury.  The aqueduct commissioners, their engineers, inspectors, officers and other employees are the servants and agents of the city of New York.  (*Mayor, etc.,* v. *T. N. Bank,* 111 N. Y. 455; *Emmett* v. *Mayer,* 128 id. 117; *Bailey* v. *Mayor, etc.,* 3 Hill, 531; *Walsh* v. *Trustees, etc.,* 96 N. Y. 428–437; *Fleming* v. *Village of Suspension Bridge,* 92 id. 368; *Walsh* v. *Mayor, etc.,* 107 id. 220; *Ehrgott* v. *Mayor, etc.,* 96 id. 266; *N. Y. & B. S. M. & L. Co.* v. *City of Brooklyn,* 71 id. 580–584; *Daly* v. *City of St. Paul,* 7 Minn. 390–396; *Hudson County* v. *Seymour,* 6 Vroom, 47; *Aldrich* v. *Tripp,* 11 R. I. 141; *Clark* v. *Mayor, etc.,* 3 Barb. 290; *City of Detroit* v. *Corey,* 9 Mich. 165; Dillon on Mun. Corp. §§ 66, 984; *People* v. *Batchellor,* 53 N. Y. 128; *Lloyd* v. *Mayor, etc.,* 5 id. 369–374; *People* v. *Hurlbut,* 24 Mich. 44–49; *People* v. *City of Detroit,* 28 id. 228; *Oliver* v. *City of Worcester,* 102 Mass. 489–499; *Hill* v. *City of Boston,* 122 id. 344–359; *Moodalay* v. *Morton,* 1 Brown's Ch. 471; Cooley on Tax. [2d ed.] 688.)  The contention by the defendant, that the appointment of these aqueduct commissioners by the state and their removal by the governor makes them state officers, is not tenable.  (*Mayor, etc.,* v. *T. N. Bank,* 111 N. Y. 455; *Appleton* v. *Water Comrs.,* 2 Hill, 432; *Bailey* v. *Mayor, etc.,* 3 id. 538; *Walsh* v. *Trustees, etc.,* 96 N. Y. 428; *Walsh* v. *Mayor, etc.,* 107 id. 220.)  The aqueduct commissioners, their engineers, inspectors and officers, being agents of the city, the doctrine respondeat superior applies, and the defendant is liable for all claims for increased cost of work arising from the mistakes, errors or misconduct of these agents in the course of the performance of the contract.  (*Mulholland* v. *Mayor, etc.,* 113 N. Y. 631; Dillon on Mun. Corp. §§ 980, 981; *Bailey* v. *Mayor, etc.,* 3 Hill, 531; *Aldrich* v. *Tripp,* 11 R. I. 141; *Pittsburgh* v. *Grier,* 22 Penn. St. 54; *Scott* v. *Manchester,* 2 H. & N. 204; *Crowley* v. *Sunderland,* 6 id. 565; *Mersey Dock Cases,* 11 H. L. Cas. 687; *Henly* v. *Mayor, etc.,* 2 Cl. & F. 331; *Du Bois* v. *D. & H. C. Co.,* 4 Wend. 285; *Starbuck* v. *Barons,* 38 N. Y. 230; *Byron* v. *Low,* 109 id. 293; *Fitzgerald* v. *Quinn,* Id. 441.)

*E. T. Lovatt* for appellants.

*Austen G. Fox, Elihu Root, James C. Carter* and *William H. Clark* for respondent. The express provisions of the statute exclude all the claims of the complaint except the first. (Laws of 1883, chap. 490, §§ 25–28, 30, 33 ; *Silliman* v. *U. S.*, 101 U. S. 466.) Under this statute the city is not liable for any damage caused by misconduct or negligence or error of the engineers or of the commissioners, because they are not the city's servants, and, as to the city, the rule respondeat superior does not apply to their acts. (*Maxmilian* v. *Mayor, etc.*, 62 N. Y. 163 ; *Terhune* v. *Mayor, etc.*, 88 id. 250 ; *Tone* v. *Mayor, etc.*, 70 id. 165 ; *Ham* v. *Mayor, etc.*, Id. 462 ; *Smith* v. *City of Rochester*, 76 id. 506, 513 ; *Jones* v. *Mayor, etc.*, 9 N. Y. S. R. 247 ; *Bamber* v. *City of Rochester*, 63 How. Pr. 103 ; *Heiser* v. *Mayor, etc.*, 104 N. Y. 68 ; *People ex rel.* v. *Mayor, etc.*, 121 id. 551 ; *People ex rel.* v. *Board of Canvassers*, 129 id. 360, 368 ; Dillon on Mun. Corp. 772.) The final estimate and certificate of the chief engineer, dated June 18, 1890, is a conclusive determination upon all claims of the plaintiffs in this action. (*Butler* v. *Tucker*, 24 Wend. 447 ; *Smith* v. *Brady*, 17 N. Y. 176 ; *D. & H. C. Co.* v. *P. C. Co.*, 50 id. 250 ; *Byron* v. *Low*, 109 id. 291 ; *Phelan* v. *Mayor, etc.*, 119 id. 86 ; *Whitman* v. *Mayor, etc.*, 21 Hun, 117, 121 ; *Sweet* v. *Morrison*, 116 N. Y. 19 ; *Kihlberg* v. *U. S.*, 97 U. S. 398 ; *M. & P. R. R. Co.* v. *March*, 114 id. 551 ; *C. & S. F. R. R. Co.* v. *Price*, 138 id. 185 ; *Brady* v. *Mayor, etc.*, 132 id. 415 ; *Thomas* v. *Fleury*, 26 id. 26 ; *B. Bank* v. *Mayor, etc.*, 63 id. 236 ; *Nolan* v. *Whitney*, 88 id. 648 ; *Tone* v. *Mayor, etc.*, 70 id. 157.) The claims to recover an excess over the contract price for a part of the work specified in the contract, because plaintiffs were, by alleged misrepresentations as to the nature of the ground, misled into making too low a bid are frivolous. (*Sherman* v. *Mayor, etc.*, 1 N. Y. 316 ; *Reilly* v. *Mayor, etc.*, 111 id. 473.) There is no proof or suggestion that the engineers were not competent and skillful men. No lia-

bility arises from such an exercise of judgment or discretion, whether right or wrong. It cannot be tried over in an action for damages. (*Mills* v. *City of Brooklyn*, 32 N. Y. 489.) There are two sufficient reasons why the request to go to the jury "on the question of whether the said paper alleged to be a final certificate was or was not fraudulent," should not have been granted. There was no such issue in the case. Fraud was not charged in the complaint. If it had been charged, there was no evidence whatever to justify the submission of the question to the jury. Fraud charged against a public officer can be established only by facts wholly inconsistent with any other theory of his conduct. (*Baird* v. *Mayor, etc.*, 96 N. Y. 567, 592; *Imp. Co.* v. *Munson*, 17 Wall. 442; *Dwight* v. *G. L. Ins. Co.*, 103 N. Y. 359.)

*Austen G. Fox* for respondent. The plaintiffs have failed to state in their amended complaint facts sufficient to constitute a cause of action against the defendants. (*Tone* v. *Mayor, etc.*, 70 N. Y. 157.) The amended complaint is fatally defective in that it does not allege any misconduct on the part of the engineer. (*M. & P. R. R. Co.* v. *March*, 114 U. S. 49.) The failure of the plaintiffs to submit to the engineer, for his decision, their claim for additional excavation caused by supposed errors in lines and levels, is of itself sufficient to bar an action therefor. (*Brown* v. *Decker*, 142 Penn. St. 640; *Scott* v. *Liverpool*, 1 Giff. 216.) Even if the complaint and evidence were not radically defective to show either a valid excuse for the attempt to proceed without a certificate, or to show that the certificate, given in fact, was fraudulent, the plaintiffs have precluded themselves by their conduct, both in this action and outside, from claiming either that there was no certificate, because given after this action was begun, or that the certificate was fraudulent. (*Swift* v. *State*, 89 N. Y. 52; *D. & H. C. Co.* v. *Du Bois*, 15 Wend. 87; *Butler* v. *Tucker*, 24 id. 447; *Smith* v. *Brady*, 17 N. Y. 176; *D. & H. C. Co.* v. *P. C. Co.*, 50 id. 250; *Sweet* v. *Morrison*, 116 id. 19; *Kihlberg* v. *U. S.*, 97 U. S. 398; *Sweeney* v. *U. S.*, 109 id. 618; *B. & O. R. R.*

*Co.* v. *Brydon*, 65 Md. 198; *Stevenson* v. *Watson*, 4 C. P. Div. 148; *Sharpe* v. *S. P. R. Co.*, L. R. [8 Ch. App.] 537.)

Peckham, J.   For a number of years prior to 1883 the city of New York had experienced the discomforts of an inadequate supply of water.

The necessity in that year for at once entering upon some work of magnitude sufficient to insure a largely increased supply for the city became imminent and inexorable.   The past growth of the municipality had been phenomenal, and provision was to be made for water not only enough for present necessities, but also sufficient for a population which the coming years were reasonably certain to see congregated within the corporate limits.   The expense of such an undertaking could, of course, be only approximately estimated, but it was certain to cost, in any event, many millions of dollars.   It is obvious that the machinery provided for the administration of the ordinary affairs of the city would be insufficient and inappropriate for devising and adopting a plan and superintending the due execution of an undertaking such as would be required in order to insure to New York the water necessary for its present prosperity and future growth.   It was necessary to resort to the legislature in order to procure the passage of a statute, by virtue of which the powers appropriate for such a work might be called into requisition and a body created fitted to discharge the functions, in some respects, of a governing and controlling tribunal, with regard both to the work itself and to the men by whom that work should be accomplished.

The legislature accordingly passed an act which is entitled "An act to provide new reservoirs, dams and a new aqueduct with the appurtenances thereto, for the purpose of supplying the city of New York with an increased supply of pure and wholesome water."   The act is known as chapter 490 of the Laws of 1883, and it contains an elaborate scheme for the accomplishment of the end in view.

The learned presiding justice who delivered the opinion of the Supreme Court in this case has made a careful synopsis of

the material portions of the act, and I cannot do better than reproduce it here. It is as follows:

"By the first section of this act the mayor, comptroller, commissioner of public works and three citizens were authorized, empowered and directed to carry out the provisions of the act in the manner thereinafter provided, and they were to be known as the aqueduct commissioners. By the second section it was provided that the commissioner of public works should, under the direction of the aqueduct commissioners, as soon as possible after the passage of the act, submit to them a plan or plans for the construction of a new aqueduct or conduit for water, and for the construction of one or more dams or reservoirs to retain such water, and for the construction of the appurtenances thereto. These plans the aqueduct commissioners might adopt, modify or reject in whole or in part, and might cause such surveys to be made as they might deem expedient to enable them to act intelligently in the premises; and it was provided that in case of the rejection of any such plan or plans by the said aqueduct commissioners, the said commissioner of public works should, in like manner, prepare and submit another plan or plans, etc., which course should be continued until a plan or plans covering the entire work contemplated by the act should be approved by the aqueduct commissioners.

"The act then provided for the acquisition of the land necessary to carry out the work. And by the twenty-fifth section it was provided that the commissioner of public works should, from time to time, as might be necessary, prepare and submit to the aqueduct commissioners and to the counsel to the corporation forms of contract and specifications, and bonds for the faithful performance thereof, for the doing of the work and the furnishing of the materials required to be done and furnished by the said approved plan, or for the doing of such parts of such work and the furnishing of such parts of such materials as might from time to time be required for that purpose; which forms of contracts, specifications and bonds were to be approved by the aqueduct commissioners, and

approved as to form by the counsel of the corporation ; and
that the said aqueduct commissioners should have the exclusive
authority to determine what provisions should be embodied in
said contract, in order, so far as might be possible, to save
the city from loss, embarrassment and litigation by reason of
any work done or supplies furnished thereunder, which
approval should be evidenced by their certificate indorsed
thereon, signed by a majority of them ; and the approval of
the counsel to the corporation was to be evidenced by his cer-
tificate to that effect, indorsed in like manner.

" By section 26 it was provided that when the form of the
contract with its specifications and the form of the bond for
the faithful performance thereof should have been approved
as above provided, the said commissioners should advertise for
sealed bids or proposals for the doing of the work or the fur-
nishing of the material called for in such approved form of
contract ; and after the receipt of such bids or proposals, by
section 28 it was provided that they should be publicly opened
by said aqueduct commissioners, who were empowered to
accept that bid or proposal, the acceptance of which would, in
their judgment, best secure the performance of the contract ;
or they might reject any and all such bids.   Section 30 pro-
vided that the contracts when so awarded were to be executed
in triplicate by the contractors on the one part and the aque-
duct commissioners, acting for the city of New York, on the
other part ; and that the work and materials called for by
such contract should be done and furnished under the direc-
tion and supervision and subject to the inspection of said
aqueduct commissioners, their engineer, supervisors and
inspectors, but such direction, supervision and inspection
might be intrusted to the engineers and other subordinates of
the department of public works so far as said commissioners
should so direct ; but in no event should the city of New
York be held in any action or proceeding brought or had
under any contract so made to any other or greater liability
than that expressed therein, nor be required to pay out or
otherwise dispose of any sum of money for the doing of such

work or the furnishing of such material greater than is stipulated in said contract, nor otherwise than in strict conformity to the terms thereof.

"Section 33 provided that all work thereby authorized to be done and all materials to be furnished involving an expenditure of over $1,000 should be procured by contract made in the manner required by and pursuant to the provisions of the act. The said commissioners were, however, empowered without contract to cause such surveys to be made and such maps and plans prepared as should, in their opinion, be necessary to carry out the provisions of the act; and might appoint and fix the compensation of suitable engineers and other persons to supervise and inspect all the work by said act authorized to be done. The said aqueduct commissioners were also empowered to procure any work to be done without contract, not involving the expenditure of over $5,000, if they should certify that, in their opinion, it was for the public interest that such work should be so done, and in such certificate they were required to state their reasons therefor."

Under the authority of this act the aqueduct commissioners published notices inviting bids for the execution of the work, which was divided into twelve sections, the total of which extended about thirty miles. The present action pertains only to section six. That section extends a distance of something over seven thousand feet. A copy of the published notice which invited bidders to bid for the contract for the construction is set forth in the record and covers some seven printed pages. It is quite minute in regard to the various details connected with the proposed work, and the form of the contract which the successful bidder would be required to sign was annexed to the notice. The bidders were plainly notified that the estimates of quantities of the various classes of work did not assume to be accurate, but came as near as possible to the work required, and the bids would be tested by those quantities. The bidders were required to satisfy themselves by personal examination of the location of the proposed work and by any other means as to the accuracy of the estimates,

and they were notified that they could not, after the submission of a bid, dispute or complain of any estimate, nor assert that there was any misunderstanding in regard to the nature of the work to be done. They were also informed that the prices they bid must include and cover the furnishing of all materials and the performance of all labor requisite and proper, and the building and completing of all the section of the aqueduct, of the materials and in the manner set forth, as described and shown in the specifications and on the plans for the work, and in the form of contract, and were further told that they would be required to complete the entire work to the satisfaction of the aqueduct commissioners and in substantial accordance with the specifications annexed. The amount of security required for the performance of the contract for the section was stated to be seventy thousand dollars.

Parties were thus fully advised in advance of all that would be required of the person who secured the contract for this work. It was to be mostly underground, and its character, therefore, could not be, at the time, definitely or accurately known. Chances had to be taken, risks to be run and unforeseen contingencies to be allowed and provided for while estimating the prices for the various kinds of work that were to be done.

The plaintiffs, after such full notice, and with opportunities for acquiring all the knowledge of the character of the work of which it was capable, made a bid for the construction of this section, which was accepted by the commissioners and a contract entered into between them therefor. Of this contract the same learned justice has made a synopsis, and again I can do nothing better than to set it forth here as containing all that is necessary to refer to in the further examination of the case. It is as follows:

"By this contract the plaintiffs agreed that they would, at their own expense and in strict conformity to the specifications in said contract contained, furnish all the materials and labor necessary or proper for the purpose, and in good, substantial and workmanlike manner excavate a tunnel and its shafts, do

all other excavation and build all masonry, and do all other work necessary to build the aqueduct and all its appurtenances from the points therein named, in the manner and under the conditions therein specified.

"Various general provisions then follow in the contract to the effect that to prevent all disputes and litigation, it was agreed between the parties to it that the engineer should in all cases determine the amount of the work, and quantities of several kinds of work which were to be paid for under the contract, and should determine all questions in respect to said contract and the construction thereof, and in all cases decide every question which might arise relative to the execution of the contract on the part of the contractor, and this estimate and decision should be final and conclusive on the contractor in case any question should arise; and should be a condition precedent to the right of the plaintiffs to receive any money under the contract. And the work to be done under the contract being mostly underground, and it being impossible at the time of the execution of the contract to estimate with accuracy the quantity of the various classes of work to be done and materials to be furnished, it was, therefore, therein stated to be expressly understood and mutually agreed that the estimated quantities stated in the notice attached to the contract should be only for the purpose of comparing on a uniform basis the bids offered; and the contractor agreed that neither the parties of the first part nor the aqueduct commissioners, nor any of them were to be held responsible that any of the said estimated quantities should be found even approximately correct in the construction of the work; that he was satisfied and would at no time dispute the said estimated quantities as a means of comparing the bids, and that he would make no claim for anticipated profits or loss of profits because of a difference between the quantities of the various classes of work actually done or material furnished and said estimate; and he undertook and agreed that he would complete the entire work to the satisfaction of the aqueduct commissioners and in accordance with the specifications and plans in said

contract mentioned, at the price therein agreed upon and fixed therefor, except for such extra work for the performance of which written orders might be received, as in said contract elsewhere specified.

"It was further agreed that the said tunnel, shafts and trenches should be excavated, and the masonry built, and all the work, labor and material to be done and furnished under the contract should be done and furnished strictly pursuant to and in conformity with the specifications attached to the contract and the direction of the engineer under them, which specifications were declared to form a part of the contract.

"By the first paragraph of said specifications it was provided that they showed the location of the work and its general character, and that during the progress of the work, working plans should be furnished by the engineer, and that all work during its progress and on its completion must conform truly to the lines and levels given by the engineer, and must be built by the plans and directions given by him from time to time, subject to such modifications and additions as he should deem necessary during its execution; and that in no case would any work in excess of the requirements of the plan or specifications be paid for unless ordered in writing by the engineer.

"Paragraph 8 declares that borings have been made on portions of the line to ascertain the nature of the underground strata through which the shaft and tunnel are to be constructed, and the results of the borings are shown on the plans; but, should the character and extent of the various materials be found to differ from what is indicated, the contractor shall have no claim on that account, and it is expressly understood that the city does not warrant the indications of the borings to be correct. And paragraph 9 provides that the places where it is believed that the excavation is to be in tunnel and where in open trench and the limits of each are shown on the plan, but if, in the opinion of the engineer, the nature of the material to be excavated at any point, or the conditions of the case shall render it advisable, he may require

the excavation to be made in tunnel, although the plans indicate that it is to be made in open trench, or *vice versa.*

"Paragraph 18 provides that masonry should be built within the tunnel at such points, and of such material, and of such form and dimensions as the chief engineer may determine from time to time, referring to certain sheets for illustrations of some of the proposed forms.

"Paragraph 19 provides for weepers of certain dimensions to be built in the side walls and floor, and that no deduction in the measurement of the masonry will be made for the weepers, which must be built true and smooth.

"Paragraph 21 provides that the tunnel at any place is to be excavated to the lines of the cross section determined by the engineer for that place, and that no payments would be made for any excavating outside of the cross section of the tunnel excavation determined by the engineer, but all loose or shaky rock must be removed.   The price per cubic yard stipulated in said contract for tunnel excavation was to cover all excavation due to the presence of quicksand or other soft material, rotten rock, boulders, etc., and the cost of all pumping and baling, of all timbering and the removal of same, of removing all excavated materials, of all ventilation, and of all other work incident to the excavation of the tunnel, and any expenses that might arise from loose and shaky rock, or from falls or cave-ins or from unexpected obstacles, was to be borne by the contractor.

"Paragraph 22.  The engineer was authorized to order at any time additional excavations in the tunnel or shafts, and the contractor was to do such excavation, which was to be measured according to the lines of the cross sections determined by the engineer, and paid for by the cubic yard as tunnel excavation.

"By paragraph 23 it was provided that if after the excavation had been made of a certain size by direction of the engineer, he should be of the opinion that the nature of the rock or other material was such that the form and dimensions of the masonry for which said excavation was intended must

be increased, he might order an enlargement of the excavation for the purpose of building masonry of greater thickness, and the contracter was to make such enlargement, which was to be measured according to the lines given by the engineer, and to be paid for at the price per cubic yard in said contract stipulated for tunnel excavation.

"Paragraph 24. In rock excavation, the drilling and blasting were to be conducted with all possible care, so as not to shatter the roof and sides of the tunnel outside of the lines determined by the engineer, and in soft material precautions must be taken not to allow cavities to be formed behind the timbering or other supports, and especially in the vicinity of the existing Croton aqueduct the blasting and timbering and other operation connected with the work should be so regulated as not to cause injury to said aqueduct. And the contractor was to be held responsible for all injuries to said aqueduct caused by his work.

"Paragraph 25. If, in the opinion of the engineer, the contractor, by the use of too high explosives, bad location of drill-holes and defective arrangements of timbers or supports, or want of proper skill or attention, should excavate the tunnel or shafts to greater dimensions than was required for the proper building of the masonry, the excess of tunnel or shaft area thus formed should be filled solid at the expense of the contractor with such kinds of masonry (brick, concrete or rubble masonry as in the said contract specified) or other material as the engineer might direct.

"By paragraph 26 the contractor was made responsible for properly supporting the roof and sides of the tunnel, and the sides of the trenches and shafts with timber or other supports. And it was further provided that if the engineer should be of opinion that sufficient and proper supports had not been provided he might order additional supports, order them modified or replaced at the expense of the contractor, and the compliance with such order by the contractor should not relieve or release him from his responsibility for the sufficiency for such supports.

"Paragraph 49 provided that all lines and grades were to be given by the engineer who might change them from time to time as he might be authorized and directed by said aqueduct commissioners, even to the extent of lowering or raising the grade line of the aqueduct, or ordering vertical or side drifts.

"By paragraph 51 it was stated that the plans and specifications were intended to be explanatory of each other, and should any discrepancy appear, or any misunderstanding arise as to the import of anything contained in either, the explanation and decision of the chief engineer should be binding and final upon the contractor, and all explanations required, alluded to or necessary to complete any of the provisions of the specifications and give them due effect were to be given by the engineer.

"By section H of the specifications it was provided that no claim for extra work should be made unless before the performance of such extra work the said commissioners should have first authorized in writing such extra work, and should have also first certified in writing for each and every order that it is in their opinion for the public interest that such extra work should be done, stating in such certificate their reasons therefor; nor unless before the performance of such extra work the price or prices to be paid therefor should likewise first have been agreed upon in writing between said commissioners and the contractor, and done in obedience to the written order of the chief engineer; and that the aggregate price should not exceed the sum of $5,000 on any one order.

"By sub. O the prices for the work and its general character were fixed; for tunnel excavation, including all work incidental thereto, seven dollars per cubic yard was to be paid; for brick masonry laid in American cement mortar, and all incidental work, ten dollars per cubic yard; for concrete masonry, including all incidental work, five dollars per yard for one composition and five dollars and fifty cents for another; and for rubble stone masonry, including all incidental work, five dollars per cubic yard, etc.

"By sub. T of the specifications it was provided that in

order to enable the contractor to prosecute the work advantageously, the engineer should once a month make an estimate of the work done and the value thereof according to the terms of the contract, which estimates should not be required to be made by strict measurement, but might, at the option of the engineer, be approximate only; and upon each such estimate being made, the contractor was to receive ninety per cent of the estimated value of the work done and materials furnished; and that whenever, in the opinion of the engineer, the contractor should have completely performed his work, the engineer should so certify in writing to the aqueduct commissioners, and his certificate should state from actual measurement the whole amount of the work done by the contractor, and also the value of the work according to the terms of the contract; and that on the expiration of thirty days after the acceptance by the said commissioners of the work agreed to be done the city should pay to the contractor in cash the amount remaining after deducting from the amount so valued, contained and stated in said last-mentioned certificate, all such sums as should theretofore have been paid.

"And by sub. U it was expressly agreed and understood that the city of New York should not, nor should any department or officer of the city of New York, be precluded or stopped by any return or certificate made or given by any engineer, inspector or officer, agent or appointee of said aqueduct commissioners from at any time showing the true and correct amount and character of the work which should be done and the materials which should have been furnished by the contractor.

"And by sub. V it was expressly understood and agreed that the action of the engineer by which the said contractor was to be bound and concluded according to the terms of his contract should be that evidenced by his final certificate, all prior partial payments being merely upon estimates subject to the correction of such final certificate, which final certificate might be made without notice thereof to the contractor or the measurements upon which the same were based."

The plaintiffs, immediately subsequent to the execution of the contract, agreed with other parties that the latter should do the work specified therein, and should receive in payment therefor a certain percentage of the amount to be paid the plaintiffs under their contract with the commissioners. In thirty-three calendar months after the execution of the contract (which was Dec. 18, 1884), the plaintiffs therein agreed to complete the whole work according to the terms of the agreement. On Wednesday, June 25, 1890, the aqueduct commissioners adopted a resolution accepting the work done and materials furnished by the plaintiffs under their contract for section 6, after making some reductions from the amount found due them under the certificate of the chief engineer.

Upon this contract the plaintiffs have been paid, on account, as the work proceeded, and under monthly estimates of the amount of work done each month, the sum of seven hundred and twenty-seven thousand, two hundred and fifty-five 83-100 dollars, and a final certificate has been given for twenty-one thousand five hundred and ninety-seven 14-100 dollars, which would make a total cost of that section of seven hundred and forty-eight thousand, eight hundred and fifty two 97-100 dollars. The plaintiffs allege that the city owes them a large amount of money in addition to the sum which has been paid them under this contract, and as the city has denied the existence of any legal claims against it by the plaintiffs growing out or by reason of the contract in question, the plaintiffs have commenced this action to recover the amounts of such claims, which they have placed at a total sum of seven hundred and thirty-two thousand, three hundred and twelve 93-100 dollars, with interest on various sums from various dates as stated in their complaint. The different causes of action are set forth in the complaint with all proper minuteness and detail.

The defendants put in an answer denying most of the plaintiffs' allegations, and also setting up counterclaims not material to be here stated.

The plaintiffs put in a reply to the counterclaims. The aggregate of the claims made in this action by the plaintiffs is

alone sufficient to show the great importance of the case both to the plaintiffs and to the city of New York.

The plaintiffs, however, had contracts of a similar nature for the construction of several other sections of the aqueduct, amounting in all to about one-half or fifteen miles of the entire work.   On each section it is said that much the same circumstances existed, and claims against the city to a large amount and of a nature similar to those in suit have been made by the plaintiffs.

In addition to that it was also stated on the argument that the other fifteen miles of the work which had been let to other contractors had given rise to the same questions, and that in truth the present action was a kind of test suit upon which would depend to a large extent the result of the claims of the plaintiffs and the other contractors arising out of the work on the balance of the sections.   It seems probable, therefore, that a sum of money amounting possibly to several millions of dollars depends upon the decision of this case, and its importance can scarcely be overestimated.   The court has felt and appreciated the grave responsibility that has been cast upon it, and this decision is the result of a careful consideration of all the facts which were proved during the trial.   The whole of the bulky record has been patiently gone over with an anxious desire that full justice should be done all the parties to this controversy.   After mature reflection, and in the light of all the testimony in the case, we have come to certain conclusions which will now be stated.

The claims of the plaintiffs are set forth in some twenty-five different causes of action contained in their complaint.   Their counsel have themselves separated the different causes of action into two classes, one of which includes claims for moneys earned under the provisions and according to the terms of the contract alluded to, and the other includes claims for the increased cost of work, occasioned by the mistakes, omissions and acts of the defendant and its officers during the performance of the work.

An analysis of the various causes of action set out in the

complaint of the plaintiffs would show that a great variety of questions would arise in the course of an examination of the evidence with regard to the specific causes of action set forth in the complaint if it became necessary to enter upon a discussion of the merits of each. For the reasons which will be stated hereafter, such an examination of most of them will not be necessary. The claim for compensation for rock excavation is the principal one in that class of claims which seeks the recovery of moneys pursuant to the terms of the contract. It stands upon a foundation by itself, and may be treated separately from the others.

*First.* The causes of action set forth in the complaint and comprising the first four counts thereof, are those which refer to this matter of excavation. It is a most important claim, and amounts, as alleged in the complaint, to about $150,000.

It is for an amount of tunnel excavation which plaintiffs allege has been done by them and has not been allowed by the chief engineer or paid for by defendant. The latter answers this claim by setting up the fact that the city has paid the plaintiffs all the moneys covered by the monthly or progress estimates of work done during the construction of the aqueduct in section 6, and that a final certificate showing a small sum due the plaintiffs has been made by the chief engineer, as provided for by the contract, and that in any event only the sum represented to be due in such final certificate can be recovered from the city. This difference between the amount of the plaintiffs' claim for tunnel excavation and the amount allowed therefor by the chief engineer does not arise from any mere alleged mistake in the measurement by the engineer of the amount claimed to have been excavated by the plaintiffs. It arises to a great degree from a radical difference in the construction of the terms of the contract between the parties. The line of limitation within which the measurement of the excavation should be made is the matter of difference between them. The plaintiffs claim that the contract calls for one line to be determined upon certain principles, while the defendant claims that the true construction of the contract calls for

another line which allows a much smaller amount of excavation. The measurement, as finally made, has been according to defendant's construction of the contract. There is no dispute as to the fact that a larger amount of excavation has in truth been made by the plaintiffs than they have been paid or allowed for, but the respondents allege that the plaintiffs have been paid or allowed for the full amount of excavation called for by the contract, and for which the defendants were under any liability to pay. The question of the construction of this contract upon the matter of the payment for excavation is one of law, and is of fundamental importance, and will be first discussed.

What seem to be the most material provisions of the contract upon this subject are the following:

By clause $F^{17}$ it is provided that "the form and area of the cross section of the tunnel excavation at any place shall be such as the engineer may determine for that place, but at all points it shall have an area of at least 201 square feet. Various forms of cross sections of the tunnel excavation are illustrated on sheets Nos. $8\frac{1}{2}$, $9\frac{1}{2}$ and 16 of the plans. On the plans the line limiting the cross section of the tunnel excavation is designated by the letters A A A."

$F^{21}$.

"The tunnel at any place is to be excavated to the line of the cross section determined by the engineer for that place."

"No payment will be made for any excavation outside of the cross section of the tunnel excavation determined by the engineer; but all the loose or shaky rock must be removed."   *   *   *

$F^{22}$.

"The engineer may order at any time additional excavations for the chambers in the shafts for the skewbacks of arches, for the sump holes or for any other purpose in the tunnel or shafts; and the contractor is to do such excavation which is to be measured according to the lines of the cross sections determined by the engineer, and paid for by the cubic yard as tunnel excavations."

$F^{23}$.

" If, after the excavation has been made of a certain size by direction of the engineer, he is of opinion that the nature of the rock or other material is such that the form and dimensions of the masonry for which said excavation was intended must be increased, he may order an enlargement of the excavation for the purpose of building masonry of greater thickness, and the contractor is to make such enlargement, which is to be measured according to the lines given by the engineer, and paid for at the price per cubic yard herein stipulated for tunnel excavations."

$F^{24}$.

" In rock excavation the drilling and blasting must be conducted with all possible care so as not to shatter the roof and sides of the tunnel outside of the lines determined by the engineer."        \*        \*        \*

$F^{25}$.

" If, in the opinion of the engineer, a contractor by either the use of too high explosives, bad location of drill holes, defective arrangement of timbers or other supports, or want of proper skill and attention, shall excavate the tunnel or shafts to greater dimensions than is required for the proper building of the masonry, the excess of tunnel or shaft area thus formed shall be filled in solid at the expense of the contractor with such kind of masonry (brick, concrete or rubble masonry as herein specified) or other materials as the engineer may direct."

Upon referring to the plans as spoken of in the clause $F^{17}$, it will be seen that this line AAA is " the line limiting the cross section of the tunnel excavation." It includes a space of a horseshoe shape, 15.53 feet from top to bottom and 15.60 feet in width at the widest part. Inside of this line is designated a ring either wholly or in part filled in with brick-work twelve inches in thickness, and the space inside this ring is 13.53 feet in height and 13.60 feet in width.

It appears that the line AAA is in reality coincident with the exterior boundary line of the brick work of the tunnel. Some of the sheets illustrating the various forms of cross

sections show the tunnel lining of brick work to be twelve inches in thickness, some of them sixteen inches and some of them even more, but they all leave the inside space of the tunnel to be such as to give the requisite size of 201 square feet.

This general statement of what appears on the plans and specifications is not substantially in dispute, but the inferences which the parties draw from the various clauses of the contract above set forth differ widely.

By the final certificate the plaintiffs have been allowed at all times at least as much excavation as was limited by the exterior lines of the brick work surrounding the tunnel at any particular point. The allowance has invariably been more than was limited by the line AAA, and such allowance has been explained by the engineer, and he stated the principle upon which it was done, so that it was always assumed that the line AAA was the true limit by which to measure the amount of excavation to be allowed the plaintiffs. Upon a careful consideration of the subject it seems to me the defendant is clearly right in the construction of the requirements of the contract upon the subject of these measurements. The measurement is governed by the clauses of the contract, which state that the form and area of the cross sections of the tunnel excavation at any place shall be such as the engineer may determine, and that various forms of cross sections of such excavation are illustrated on sheets of the plans, and that on the plans the line limiting the cross section of the tunnel excavation is designated by the letters AAA, and that no payment will be made for any excavation outside the cross sections of the tunnel excavation determined by the engineer.

The plaintiffs say these cross sections could not be determined by the engineer in advance of the progress of the excavation, and that the contractors could not earlier know just exactly what the cross section was at the point where they were excavating, and that until the cross sections were definitely defined after the excavation was made, there could be no absolutely accurate line for determining the exact amount of

excavation which should be allowed.   They say that in deter-
mining the cross section after the excavation was made, regard
should be had to the necessary amount thereof taken out in
excess of the area for the tunnel, because of the impossibility
of cutting out the precise area required through a substance
like solid or soft rock, which could not be cut, as was said,
like a piece of cheese.

Whether the cross section could be accurately determined
before the excavation is not the material point.   The contract
provided what the rule should be for the determination of the
cross section whenever it was determined, and that rule was to
determine it in conformity to a line appearing on the sheet
annexed to the plans and marked AAA, and that line was
coincident with a line which was exterior to the brick work or
lining of the tunnel.   Beyond that line, the contract, in terms,
provided that no payment should be made.   The plaintiffs,
also, refer to a section of the contract which they say char-
acterizes, and to an extent, explains the meaning of the other
clauses already spoken of, and they urge that such section
makes it plain that the engineer was to allow in determining
the cross section, a certain amount of necessary excavation
beyond the area in which the tunnel and its lining could be
placed.

They refer to the clause ($F^{25}$) last above cited, and from it
they argue that the meaning of the contract is that if they
excavate no more than is reasonably necessary while guiding
their blasting with care and caution, the excess of the excava-
tion is to be paid for, while the penalty provided for excessive
excavation is their liability to fill up at their own expense the
space unnecessarily excavated, with solid masonry of such
material as the engineer may direct.   There seems to me no
connection between the two matters.

As to excavation, the contract provides it shall be measured
by the cross section determined by the engineer, however that
may be done, and payment shall not be made for any
excavation beyond the line of the cross section determined as
stated.

This 25th section does not in any manner interfere with, explain or control the meaning of these other clauses already alluded to. The effect is that not only shall the contractor receive in no case any pay for excavation outside the cross section line, but if the excess of excavation is caused by negligence or using too high explosives, etc., he shall fill up the excess at his own expense.

It does not seem to us that there are any other clauses in the contract, plans or specifications which can alter what we regard as the plain meaning of those already cited, and by which the plaintiffs are limited to the excavation necessary for the tunnel and its lining. The plaintiffs, however, urge that the line AAA was never intended as a line of payment, but only as a line of guidance for the placing of the drill holes so that the excavation should be at all times as much as that line indicated, and as little more as possible, and that the cross sections to be thereafter determined by the engineer, were to be so determined with reference to the fact that the excavation could not, with the utmost care and caution possible, be restricted to absolutely the area necessary for the aqueduct with its brick lining.

I can draw no such inference or condition from the language employed in the contract, but, on the contrary, it still seems perfectly plain that the cross sections whenever they were taken or how, should be determined by the engineer with reference to the exterior line of the brick work lining the tunnel.

The fact that the contract provided for working plans to be thereafter furnished the contractors, and that the contract stated that the plans were to show the location of the work, and its general character, does not affect the question. There were working plans subsequently furnished, and the engineers did give orders, from time to time, in the course of the progress of the work, relative to the same. There is no pretense that any working plan, or any orders, provided for or directed an excavation outside of and beyond the area necessary to build the aqueduct with its lining of the thickness which was required at any particular place. We, therefore, think the

engineer had no discretion in fixing his cross sections, but that· when the thickness of the lining had been settled at any given point, then the cross section should be determined in accordance with the fact as heretofore stated.

If this be the correct interpretation of the meaning of the contract then both parties must be bound by it even though it should seem to be unjust or oppressive in its nature.   The parties have so bound themselves would be the answer to any claim of injustice or oppression.   In truth the language seems so plain that we could readily believe an assertion that parties· who bid on the work did so in the light of this meaning as to excavation, and that in consequence the price bid for this kind of work was regulated accordingly.

We are, as a result of the examination of this contract, brought to the belief that the cross section, beyond which no· payment for excavation could be made, was to be determined in accordance with the views just expressed.

A final certificate embodying the results of measurements made upon such a basis would be the evidence upon which the plaintiffs must rely in their action.   It appears the chief engineer has made his final certificate on this basis.   Assuming the principles of the measurement to be correct, there is no claim that any mistake has been made in the mere process of measurement upon the basis actually adopted.

The contract provides, in clause 7 of general clauses, for monthly estimates of work done during the preceding months, and for the payment of ninety per cent of the estimated amount, but it is expressly stated that such estimates are not to be required to be strictly accurate, but may be approximate only.   And whenever, in the opinion of the engineer, the contractor has completely performed his contract, the engineer must so certify in writing to the aqueduct commissioners, and in the certificate he must state from actual measurements the· whole amount of work done by the contractor and its value under and according to the terms of the contract, and thirty days thereafter the commissioners will pay the amount stated. in the certificate.

By clause V of the contract the contractor agrees that the action of the engineer which is to bind such contractor shall be evidenced by his final certificate, all prior partial payments being made merely upon estimates subject to the correction of such final certificate, which may be made without notice thereof to the contractor or of the measurements upon which the same is based.    The contractor also agreed not to demand or be entitled to receive payment for the contract work or materials or any portion, except in the manner set forth in the contract, nor unless all its provisions had been kept and the engineer had given his certificate to that effect and the aqueduct commissioners should have accepted the work.

A final certificate was introduced in evidence by the defendant under which it appeared that there was due the plaintiffs some twenty-one thousand dollars, and the defendant claimed that the plaintiffs were bound by that certificate and could collect no more than the amount specified therein.

To this the plaintiffs interpose several answers.  They say that the engineer on February 7, 1887, duly decided under a provision of the contract empowering him so to do, that the true interpretation of the contract was for an equitable allowance for excavation over and above the strict amount necessary to provide for the aqueduct, and that pursuant to such decision the plaintiffs for some time thereafter were allowed on monthly estimates for excavation on such a basis, which was beyond the exterior line of the brick work of the tunnel, and that such measurements had been continued up to the time of a change in the office of chief engineer, and in the personnel of the aqueduct commission, and they claim that the decision of the former chief engineer as to the manner in which future measurements of excavation should be made, was binding in regard to all such future measurements, and that it must be the guide in making measurements for the final certificate, although to do so would, of course, overturn the principle upon which the measurements had been made up to the time of the decision of February seventh.  It was said that the provision referred to regarding the conclusiveness of the final

certificate when made did not apply to or reach such a case, because there had been a proper determination as to the true basis for these estimates, which determination was made permanent by the express terms of the contract, and if the final measurements, as shown by the final certificate, did not proceed upon the same basis it was clear and conclusive evidence of a mistake and of such a nature as would allow plaintiffs to recover for the extra amount of excavation notwithstanding such final certificate.   It was also alleged that the final certificate had not in fact been made before the commencement of this action, but that it had been .wrongfully, willfully and unreasonably withheld, and the plaintiffs could, therefore, maintain this action without producing such certificate, and could recover for the just amount of excavation upon the basis of the decision of February seventh, and upon proving what was "unavoidable excavation" outside of and beyond the lining of the tunnel.

It was also alleged that the final certificate was the result of and was in itself a fraud upon the part of the chief engineer who made it, and hence it was no bar to this action.  An estoppel was also claimed to exist in favor of plaintiffs.   Upon the question of the decision of the former chief engineer, plaintiffs cited provision " B " of the contract.

That provision says that " to prevent all disputes and litigations, it is further agreed by and between the parties to this contract that the engineer shall in all cases determine the amount or the quantity of the several kinds of work which are to be paid for under this contract, and he shall determine all questions in relation to said work and the construction thereof, and he shall in all cases decide every question which may arise relative to the execution of this contract on the part of the contractor, and his estimate and decision shall be final and conclusive upon said contractor ; and such estimate and decision, in case any question shall arise, shall be a condition precedent to the right of the party of the second part to receive any money under this agreement."

Paragraph 51 of the general clauses of the contract also

states that the decision of the chief engineer upon any mis-understanding which has arisen as to the import of anything contained in the plans or specifications, shall be final and binding on the contractor.

In addition to the omission in both these clauses to provide that the decision of the engineer shall be binding on the commission there is a special clause in the contract that the commission or their successors shall not, nor shall any department or officer of the city of New York, be precluded or estopped by any return or certificate made or given by the engineer under or in pursuance of anything contained in the contract, from at any time showing the true and correct amount and character of the work done or materials furnished by the contractors or any other person under the contract.

It appears from these citations that the decisions of the engineer are only made final and binding upon the contractor, and hence the defendants are not prevented from asserting the true construction of the contract under any of these clauses. The fact that the same expression is used in two widely separated clauses of the contract shows that neither the provision for binding the contractor by the decision of the engineer nor the omission to provide that the decision of the engineer should be final and binding upon the aqueduct commissioners or any one in whose behalf they acted was at all inadvertent. Neither of these provisions authorizes the engineer to finally bind the commission by any decision he may make during the progress of the work. The affirmative provision that the commission shall not be bound, places the matter beyond all question, and leaves it at liberty to contend for the true and legal construction of the contract, notwithstanding any so-called decision of a chief engineer to the contrary.

This contract bears evidence of extreme care and caution in its preparation, and it was intended evidently to guard the interests of the city to the greatest extent possible consistently with the procurement of the work by responsible and capable contractors. In all large and public works experience has shown the necessity for this endeavor. There is no spur like

self-interest in business enterprises, and it may be regarded as certain that the contractor will always take care of his own interests so far as it is possible. This is natural and proper, and no fault can be or is found with such a fact. But how far the officers or employees who represent the general public or the corporation which is building the work can be depended upon for steady, earnest, zealous and able attention to the public interests is always a matter, to say the least, of some doubt. Hence the provisions for the binding force of the engineer's decision upon the contractors and an omission of any such provision in relation to the other parties to the contract.

In fact, however, the evidence plainly shows, as it seems to me, that the proceedings which led up to the writing of the much-talked-of letter of February 7, 1887, were not taken, nor was the letter itself written and sent to the committee, with any view of obtaining or pronouncing a decision upon the question of excavation which was to be a binding rule upon the commission and which it expected to follow and be controlled by, whatever it might be.

The main idea would seem to have been on the part of the construction committee to obtain an exact and specific statement of the claims of the contractors, and then to obtain for the information and use of the commission itself, the opinion of the chief engineer upon the subject of those claims and their allowance. The language used to the contractors by some members of the commission, as alleged, that the engineer would give them a ruling on the matter of the excavation, is perfectly consistent with this view. Certainly the very purpose of referring the matter to the chief engineer was to get his opinion or ruling on the question, but the fact that the latter officer treats the matter in the light of a report to the construction committee and not as a decision by him which he was entitled to finally make under the contract, and regardless of the future action of any one, shows what the understanding was upon the subject. A reference to the history of this

so-called final decision by the engineer, I think, makes the whole matter perfectly plain.

The question of the allowance for excavation was raised by the plaintiffs, by a demand upon the aqueduct commission for a greater allowance. The demand was in writing and addressed to the chief engineer, but the plaintiffs proposed to show, and claimed that the aqueduct commissioners acted upon it by referring it to him.

The minutes of the construction committee of the aqueduct commissioners show that they received such a communication from the plaintiffs, and also from the contractors for the other sections of the aqueduct, and that they were referred to the chief engineer, and he was directed to communicate with the contractors and request them to present their claims in writing, stating specifically the points for which they claimed extra compensation, and that after the receipt of such communication the chief engineer should fix a day when they could be heard upon the subject. Subsequently the chief engineer asks the contractors to send him their claims in writing, and it appears from the minutes of the same construction committee that at a meeting of the committee held on January 28, 1887, the contractors appeared before the committee and were given an opportunity to state their views to the committee as to their claims for tunnel excavation. The committee then referred the matter to the engineer. That official, as the contractors state, after consultation with some one, prepared a report to be made to the committee in answer to the reference of the question to him, and before handing it in, he read it aloud to the contractors and asked if they accepted it, and they said they did. He then took it to another room and handed or sent it to the committee. He thus became satisfied in advance that his opinion would be favorably received by the contractors. In that opinion he did state that in his view the contract properly construed, permitted and provided for equitable cross sections beyond and in excess of the area required to be excavated for the tunnel and its lining. There seems to be some indefiniteness in regard to the identity of the report made

by the engineer, there being two letters (and possibly three to be gathered from the evidence) written by him, each of which differs somewhat from the other, but I assume the first letter set forth in the record, and dated February 7, 1887, is the report which the engineer in fact signed and sent to the committee on construction.

Up to this time the measurements had never been outside of the exterior line of the brick work of the tunnel.  Subsequent to the making of the report there is evidence that a few monthly estimates were made upon the basis recommended therein.  One witness thought as much as one-seventh of the whole amount of such estimates was so made.  It would seem as if this must be a mistake.  On the 25th of February, 1887, the plaintiffs made a written demand on the aqueduct commissioners that the engineer be instructed to make his estimates in accordance with his ruling of February seventh, showing it had not been done up to that time.  It is testified that as early as in May, 1887, fault was found by the contractors with the engineer, because he did not estimate on the basis of his letter of February seventh, and he answered that the commission would not permit it.  There is no evidence of any change on the part of the commission on that subject during the summer, while in the fall it appears by the record that the question was under discussion and the plaintiffs were not obtaining their estimates under the February letter as they claimed they ought.  It would, therefore, seem that in any event but a very small amount of estimates was ever made by the engineer upon the basis of this February report.  It may be assumed though that the amount was one-seventh of the whole, and yet the fact is not material.

The question was never regarded as finally settled by the report, nor was it acquiesced in by all parties.  There was general and almost daily discussion among the parties on every side in regard to the contract as to what it meant and what it did not mean.  The construction committee no later than the 7th of March, 1887, asked the chief engineer to form a code of rules for estimating the extra excavation, and it had

not up to that time formally approved the plan contained in the report, but, on the contrary, it was matter of debate. On the 28th of March, 1887, in accordance with the request by the committee the chief engineer sent to it a communication embodying what is termed " the four rules " for the measurement of excavation. These four rules did not give as much excavation as did the report of the engineer to the construction committee, as they limited the line of allowance for excavation to the external boundary line of the masonry or other supports ordered by the engineer in accordance with sections F 17, 20 and 21.

Yet the construction committee, at a meeting held at some time prior to the 20th of April, 1887, adopted a report to the aqueduct commission, recommending the commission to approve and adopt the report of the chief engineer, dated February 7, 1887, for the measurement of the excavation under the contract.

The aqueduct commissioners held a meeting on the 20th of April, 1887, at which the report of the committee on construction was read. The adoption of the report was opposed by one of the commissioners (the commissioner of public works), who read a copy of a letter addressed by him to the counsel to the corporation, and also an opinion of that official dated that day (April twentieth), and then the report by the committee and the communication of the commissioner of public works to the counsel to the corporation and his reply were referred back to the construction committee. The latter committee met on the twenty-fifth of April, and adopted a resolution rescinding and repealing every resolution or action of the committee, prescribing rules and methods for the measurements of excavation in the tunnel, and recommending the chief engineer and his subordinates to conform, in all their determinations and estimates as to quantities, strictly to the provisions of the contract as the sole rule for such determination.

This resolution was reported to the aqueduct commissioners, at a meeting held by them on the twenty-seventh of April, and the report of the committee was unanimously adopted.

It was subsequent to the adoption of that resolution and some time in May, 1887, that the contractors had the interview with the engineer above spoken of, in which they found fault with him for not estimating their excavation upon the basis of his February letter, and in that interview the engineer answered that he did not so estimate upon the excavation, because the commissioners would not allow him to do so, and he said they had directed him to be governed by the corporation counsel's interpretation of the specifications. The interpretation of the corporation counsel was entirely adverse to the claims of the contractors, and to the interpretation of the contract as made by the engineer on February seventh.

The disputes upon the question were kept up all the summer of 1887, the contractors asking for estimates upon the basis of the February letter, while the engineer omitted to give them, although stating he thought his interpretation of the contract as contained in that letter was the true one, but the commission would not accept it or permit such measurements. In November, 1887, the construction committee appointed a sub-committee to meet with the corporation counsel and comptroller, and confer with them on the subject of the contractors' claims for terminal excavation. Upon notification the contractors appeared before this sub-committee and on December 8, 1887, the sub-committee, with the assent of the corporation counsel and the comptroller and the chief engineer, adopted a resolution by which it was decided that the cross section of tunnel excavation (excepting timber sections) should be the area of the conduit plus that of the masonry around the conduit necessary to preserve the shape of the conduit against the surrounding medium, allowances to be made for the necessary weepers and other contrivances especially mentioned in the contracts.

On the 28th of December, 1887, the committee on construction announced to the contractors that if they would agree to it the committee was willing to adopt and approve the resolution recommended by the sub-committee, and would report their views in the premises to the aqueduct commissioners for

their approval. The contractors declined the proposition and requested that the matter of the measurements to be allowed them should be postponed to the time the final estimate should be made. The construction committee, notwithstanding this refusal, then adopted and approved the resolution as containing the views of its members as to the principle which should guide the chief engineer in his determination of the form and area of the cross sections of the tunnel excavation on the aqueduct.

This resolution was also approved by the aqueduct commission on December 30, 1887. Subsequently it, in common with all other rules and methods for measuring excavation, was repealed by the commission. This is the history of the alleged decision of the chief engineer of February 7, 1887.

The decision was a mere report in answer to the committee on construction of the aqueduct commission, and was received by such committee as a report made to it after the committee had heard the claims of the contractors, and had referred the matter to the chief engineer for his report on the subject. In no way can this opinion or report be regarded as binding upon the defendants so as to prevent their urging the true construction of the contract.

The next answer of the plaintiffs is that the final certificate had been wrongfully, etc., withheld. There was considerable evidence given upon this question, but in the light of the construction which we give to the contract as to the basis for measurement, it is not very important, for if there had been such withholding the plaintiffs would then have to prove the amount due for excavation, and it is not alleged that if the basis of the chief engineer be taken more would be found due the plaintiffs than the final certificate calls for.

A brief reference to the evidence may not be out of place, although for the above reason quite unimportant.

There can be no question, from the evidence in this case, that prior to the commencement of the action a final certificate was made out and signed by the chief engineer and sent to the construction committee (which, I believe, was composed of all

the members of the aqueduct commission), and received by it on the 18th of June, 1890, and the action herein was commenced June 25, 1890. There is some evidence that this certificate was taken back from the custody of the secretary of the commission, and subsequently a certificate was returned, and whether the latter was the same one which was first filed is claimed to be doubtful from the evidence. The claim is that there is no proper proof of the delivery on June 18, 1890, of the final certificate actually produced on the trial, because it is not identified as the one which was filed on the eighteenth of that month, and if not, it is claimed that the certificate produced on the trial was not filed until after the action was commenced. I think the evidence on the subject is entirely too vague to in any way impeach the accuracy of the statement that a final certificate had been filed on the eighteenth of June.

If it had been filed in fact before the commencement of the suit it furnishes a perfect answer to any claim of an unreasonable withholding thereof. It might be assumed in that event that up to that time it had been unreasonably withheld, and that it ought to have been filed long anterior to the time it actually was, and still if it were filed before the suit was commenced, the plaintiffs could not allege the absence of such a certificate nor its unreasonable withholding theretofore. It was then in existence and bound the plaintiffs. If they had sustained damage by its unreasonable withholding, that would be a totally different matter, not material so far as any cause of action was alleged or proved.

If, however, it should be assumed that there was evidence tending to show the commencement of the action prior to the filing of the certificate, then the plaintiffs were bound to show that it had been unreasonably withheld. This I think they wholly failed in proving. It is true the division engineer testified that the last work of what may be termed original construction, as distinguished from repairs, so called, in this section, was done somewhere about the 15th or 20th of May, 1889, and that he had in his office on the latter day all the materials which bear upon these cross section sheets as neces-

sary for their measurement.    The final certificate was not sent to the chief engineer until June 15, 1890, a period of about thirteen months.    There was a large amount of figuring to be done on these cross section sheets, as well as other matters, before a final and correct estimate could be made, and there were demands for a final estimate coming in from all the various sections about the same time, thus making an immense mass of work for the engineer's department.    In addition to all this, however, there had been discovered in the middle or latter part of the summer of 1888 evidences, as claimed by the engineers, of bad or fraudulent work throughout this and other sections of the aqueduct, and to such an extent as to furnish a very grave problem as to what should be done in regard to it.    The claim of bad work was disputed most vigorously and earnestly by the plaintiffs, but it is not denied that an immense amount of work was thereafter done by the plaintiffs in the way of grouting in the tunnel, and in obedience to the demands of the commissioners and engineers, in order to make the work conform, in their opinion, to the requirements of the contract.    All this work was not fully completed until March, 1890, and until it was completed to the satisfaction of the engineers and commissioners, none of them would or did regard the tunnel as completed, or would certify to its completion or accept it as completed.

While the aqueduct commissioners and the engineers were thus insisting that a large amount of the work on the structure which had been performed by the contractors was bad work and was not a compliance with the contract, and that the alleged defects must be attended to and repaired, no one could say that the engineers were in any way negligent if while this work was in progress they failed to occupy themselves in measurements or computations for a final certificate.

The work was at last done, and although the contractors disputed the necessity or propriety of what is termed the repairs, yet they did the work as directed by the engineers, and subsequent to its completion the final certificate was furnished within a reasonable time.

The further claim that the final certificate is the result of the fraud and dishonesty of the chief engineer, has for its foundation the assumption that the engineer had a discretion to allow equitable cross sections including more than the exterior lines of the tunnel lining. The plaintiffs allege that the chief engineer, while possessing such power and discretion, and also while himself believing that he possessed it, knowingly certified to a system of erroneous cross sections by which plaintiffs were cut out of compensation for a large amount of excavation, and that he so acted simply to please the aqueduct commissioners, although perfectly cognizant of the fact that his action was wrong.

Of course the foundation of this claim must be the right of the engineer to make these equitable cross sections and allowances for excavation. If by the terms of the contract he had no such right, the first material fact upon which to base an allegation of fraud is carried away.

Holding, as we do, that the chief engineer had no such discretion, and that the final certificate gave the plaintiffs credit for all the excavation that the contract permitted them to claim compensation for, it is not very material to inquire as to the promises of this officer, made when he was a subordinate, to allow plaintiffs for excavation, an amount which we hold they were not entitled to by this contract. Conceding that he thought he had the right which plaintiffs claim he had, and that nevertheless he obeyed the directions of the commissioners and allowed for less excavation than he was convinced the plaintiffs were entitled to under the provisions of the contract, still the plaintiffs prove no fraud in regard to the certificate, so long as it appears that, in fact, the defendants have been allowed for every yard of excavation that the contract entitled them to. Upon this question and upon this subject the engineer occupied no such position as an ordinary arbitrator upon a disputed question submitted by the parties for decision, and which, by the terms of the submission, he had the power to finally render. If the engineer had the right, as the plaintiffs claim, to determine the cross sections with reference to such

equitable considerations as the nature of the case and the exist-
ing facts might, in his opinion, call for, then, indeed, his posi-
tion would be analogous to that of an arbitrator upon that
point, and he would, in the honest discharge of his duty be
compelled to allow cross sections measured by those equitable
considerations.    As he had no such power, his duty was to be
governed by the terms of the contract, and in measuring
according to its provisions he was, of course, bound to measure
honestly and give the plaintiffs the benefit of all excavation
actually made upon the basis of the contract itself.    There is
no claim or proof that he has not done so.    The plaintiffs
were not entitled to a certificate for excavation, which exceeded
the limitation of the contract, simply because the engineer
wrongly interpreted the contract, and if left to his own guid-
ance, would so certify.    If his own view were erroneous in
law, and if the views of the commission embodied the true
legal construction of the contract under which the measure-
ments for excavation ought to be and were ordered made, the
engineer had the right to follow those orders, even though he
believed them erroneous, and to make his measurements for
excavation in accordance therewith.    He would have violated
his duty by measuring in accordance with his erroneous belief
as to the requirements of the contract, and in refusing to be
guided by the directions of the commission, when those direc-
tions embodied the true meaning of the contract.    Under our
construction of that meaning, there is not the slightest evi-
dence of fraud with regard to the final certificate.

There is still less evidence to support any claim of an estop-
pel against the defendant, based upon any action of the chief
engineer in making his report of the 7th of February, 1887, or
upon that of the construction committee.    The plaintiffs were
under a legal obligation to go on and complete their work
under the contract, and they had the right to receive their pay
in accordance with its terms, and there was no action on the
part of any one that could form the basis of an estoppel as
against defendant, and preclude it from showing the truth as
to the meaning of the contract.

The plaintiffs also claim that in any event they are entitled to retain the amount of money paid them upon the estimates which were made under the rule announced in the February report of the engineer. This they claim was paid upon a finding or ruling of the engineer and when paid it cannot be recovered back. It is not recovered back. The monthly or progress estimates were approximate only, as provided for by the express terms of the contract. It appears that some of them were made upon a mistaken basis for the measurement of the excavation in the tunnel, and the result of such mistaken basis was to credit the contractors with more excavation than by the terms of the contract they were then entitled to. This mistake was corrected upon making up the measurements for the final certificate, and the plaintiffs were therein credited with every yard of tunnel excavation which they were entitled to by the terms of the contract.

This concludes the examination of the plaintiffs' claim for compensation for excavation according to the terms of the contract and pursuant to its requirements. We cannot see how it can be allowed. The final certificate stands as the measure of the liability of defendant for such excavation.

In regard to all the other claims of this class, to recover for work done pursuant to the terms of the contract, we think the same answer is to be made as in the case of such excavation. The plaintiffs fail to make out a case for the recovery of any greater sum than is represented and allowed in the final certificate.

*Second.* Having decided that the plaintiffs cannot recover any greater sum than that admitted to be due them in the final certificate for moneys earned under the provisions of the contract, we come to the consideration of that class of claims set up by the plaintiffs for the increased cost of work, occasioned by the alleged omissions, mistakes or acts of the defendant, or of those officers for whose acts the defendant is alleged to be responsible, in the course of the performance of the work.

One of the chief causes of action of this character is for the increased cost of the work actually performed by plaintiffs,

occasioned by alleged erroneous grades, lines and centers given them by the engineers of the commission. The plaintiffs allege they proved a *prima facie* case for a recovery, and that their evidence should have been submitted to the jury for its determination. The validity of these claims must be tested by a reference to the statute creating the aqueduct commission and to the contract which was executed pursuant to the provisions of that act. The circumstances existing at the time of the passage of the act and which led to its passage, may be regarded for the purpose of furnishing something in the nature of a guide to its proper construction and interpretation. The same circumstances may also be regarded for the same purpose in the course of an examination of the provisions of the contract itself, should that duty become important or material. It was, of course, apparent that the city was about to be subjected to an enormous cost for the construction of an aqueduct, which was to convey the water a distance of some thirty miles for distribution through its different streets. It was a work which would necessarily continue for several years before the completed structure could be available for general use. Commissioners, engineers, inspectors, clerks and other employees would be necessary in the progress of the work. It would be an exhibition of nothing more than ordinary caution for the legislature to provide restrictions upon the powers of these various individuals to represent the defendant and to render it liable for their acts. One would naturally look for a special and well-defined channel provided for by the act, in and by which such persons should be enabled to create any liability on the part of the defendant for their acts or omissions, and outside of which no such liability should exist. Obviously, if a liability to contractors themselves, arising outside of and beyond the contract, and in the course of its performance, were to be created by the errors or omissions of any one of the small army of officials who were to be employed for this work, from the aqueduct commissioners and their chief engineer down through the various grades of service, the cost of the undertaking would be incalculable,

and defendant's liabilities to the contractors for work done pursuant to the terms of the contract would not be at all measured by the terms of the contract itself. The amount would be unknown until the Statute of Limitations had run against all possible claims which might be made subsequent to the completion of the work. A host of claims based upon allegations of errors or neglect or improper measurements or dishonest action on the part of the persons connected with the commission would be certain to arise, and disputes and almost endless litigation would be the inevitable result. Witnesses would, in the meantime, scatter, die, forget or disappear, while the claimants would remain alert, positive, intelligent and of good memories. The defendant would be placed at the greatest disadvantage in all such contests. Was it not the plain duty of the legislature, while providing for the performance of and payment for a work of such large proportions, to also provide a check or bar to any further liability to the contractor for the work than should be found in the contract itself? It seems to us plain that such was the duty of the legislature, and after a perusal of the whole act, and particularly considering the thirtieth and thirty-third sections of the same, we think it equally plain that such duty was performed.

It is said that all corporate bodies or municipalities must of necessity and from their structure be compelled to rely upon the acts of their agents or servants, and they must also of necessity be liable for those acts or negligent omissions to act. It is true the municipal corporation, like other bodies of that nature, must act through agents, and in carrying on the ordinary business of the corporation a liability is frequently cast upon the municipality arising from the mistakes or neglect of its agents or servants which it would be difficult, if not unjust, to provide against. This case, however, presents different features.

When one special undertaking is to be entered upon, of such immense proportions and of such large cost and liable, in the course of its construction to occupy so long a time, the opportunity to provide safeguards against a liability to con-

tractors for the work outside of certain means and methods for creating it, would naturally be embraced by the legislature. It would almost certainly endeavor to narrow the means and methods of creating a liability and enact that outside of or beyond them no liability should arise. This would cause no unfairness towards any one dealing with the commission or its employees. As there was a special act which provided for and created them, or permitted them to be created, that act would necessarily be referred to as the source of their power and the measure of their ability to represent the defendant. These facts are proper to be considered when the act is subjected to the scrutiny of the courts.

And, first, the contract which is provided for in the act is seen to be the result of the most careful attention. The forms of the contract are to be provisionally drawn under the supervision of the commissioner of public works, who is to submit them to the aqueduct commissioners and to the approval of the counsel to the corporation, while the commissioners are to have the exclusive authority to determine what provisions should be embodied in the contracts in order, so far as possible, to save the city from loss, embarrassment and litigation. The form of the contracts and specifications and of the bond for performance thereof, was to be finally approved by the commissioners and so certified by them in writing indorsed thereon.

Then proposals were to be advertised for and the contract awarded upon them. Attention is specially called to the provisions of sections 30 and 33 of this act, as they are found in the analysis of the statute already set forth herein. In no event, says section 30, shall the city of New York be held in any action or proceeding brought or had under any contract so made, to any greater or other liability than that expressed therein, nor required to pay out or otherwise dispose of any sum of money for the doing of such work or the furnishing of such material greater than is stipulated in said contract, nor otherwise than in strict conformity to the terms thereof.

Although the act permits the direction, supervision and inspection of the work to be done and furnished under the

contract, to be intrusted to the engineers and other subordinates of the department of public works, so far as the aqueduct commissioners shall direct, yet the provision that the city shall in no event be held liable, etc., immediately follows the permission thus given. The position of this provision in the act is quite suggestive upon the question of the liability of defendant for the acts of those who were performing duties for the city by virtue of this statute. When those who confessedly were city officers, and thus to some extent or for some purpose representatives of the city, were permitted by the terms of the statute and by reason of their position to do certain work upon the aqueduct, if directed by the aqueduct commissioners, the provision for the non-liability of the city excepting under the contract, follows such permission at once. The non-liability of the city is not in terms or in fact confined to those officers thus specially named, but the principle is fittingly announced at that point. Even for the acts of city officers the city was not to be liable. Whether, therefore, the persons who did the work under this act and by virtue of the employment by the aqueduct commissioners were strictly within the definition of city officers for whose acts the defendant might be liable to third persons is not, in the view I take of the case, very material, and it is unnecessary to either discuss or decide it.

With reference to any claim of the contractors, if the work done by them and for which compensation is demanded, has been done under the contract, the measure of the liability of the defendant must be sought in that document, and it cannot be held for any negligent act of the aqueduct commissioners or their employees or subordinates in carrying out such contract. Now, is not this action for increased cost of the work done by plaintiffs, occasioned by the errors of the engineer's department in giving erroneous grades, lines and centers, an action brought under this contract? It is said that the duty rested upon the officers of the commission who were the engineers to give correct lines and levels to the plaintiffs, and their failure to do so constituted a wrongful act on the part of

the persons representing the defendant, and for such wrongful act the defendant is liable as for a common-law liability. I do not see that this description of the character of action changes the fact as to its origin. The liability of the defendant may be described as a common-law liability. That is only saying that on the facts thus stated an action would lie based upon the principles of the common law against the defendant on account of the negligence of its agents. Is that fact at all inconsistent with the other fact that the common law gives an action because of the execution of this contract and the duty which the defendant owed the contractors by virtue of its provisions? It is a liability as stated, on the part of the defendant, to answer for a negligent act of one of its representatives by which damage is caused, and in this case the negligent act which causes the damage is a failure to carefully perform a duty which the defendant is bound to perform and which arises only because of the execution of this contract with the plaintiffs by the so-called agents of the defendant. The defendant proceeds through its agent to give a grade made necessary simply because of this contract and for the sole purpose of enabling the contractors to carry out its provisions.

Laying out of view for the moment the provisions of section 30 of the statute, and assuming a liability on the part of the defendant for the mistake of the engineers on this matter of grades, does not the liability arise out of the provisions of the contract? The duty to give correct grades arises because the plaintiffs have contracted to excavate upon grades given by these engineers and as they shall direct, hence the obligation to give correct grades is implied from such facts. It is none the less a contract obligation because only arising from an implication founded upon the provisions of the contract and necessarily arising therefrom and not mentioned therein in specific terms. If not really and in substance brought on the contract, it is an action which is brought under the contract, that is, by reason of its existence and because and in the course of carrying it out. Such a cause of action, it seems to

me, is within both the letter and spirit of the statute, within its meaning and within its equities. The act requires what this contract complied with, viz., a contract for the faithful performance of the terms thereof and for the doing of the work and the furnishing of the material required, to be done and furnished by the approved plan, etc. (Section 25.) The contract itself provided for such a performance and for the doing of such work and the furnishing of the materials, which were done and furnished by the plaintiffs, as alleged in this cause of action under discussion, and for the work so done and the materials so furnished the contract provided for the payment of certain prices. The work actually done is work done under the contract, and the negligence of the engineer in giving these grades and lines is also, as it seems to me, a liability (if it would exist at all) under or on account of the contract and by reason of its provisions. An action to recover the damages thus alleged to have been sustained, is brought or had under, that is, by reason of the contract in question, and I think the statute prohibits, and was intended to reach and prohibit, just such a cause of action as is herein set up.

It is wholly unnecessary to refer to any other sections of the statute, or to examine with any detail the provisions of the contract for the purpose of seeing whether any further limitations can be found which would make this question plainer. It is as plain as necessary now ; and yet a perusal of the contract itself, as shown by the analysis already herein set forth, shows that it was drawn to provide for all the work, of every kind and description, which should be called for in the course of the building of this aqueduct, and for all such work, and for the furnishing of all the necessary materials the contract provided special prices should be paid. Extra work, or work outside of the character or amount of that specified in the contract, was provided for and a way pointed out which was to be followed in order to bind the defendant. If work were done of this character without complying with those forms, or without its being provided for in the contract, then no compensation for such work could be recovered. It seems to

me that the statute contemplated a liability on the part of the respondent to be specifically set forth in a contract, and that, beyond the terms and conditions of the contract, there should be no liability of the defendant for any work done or materials furnished in the course of the erection of this work.

It was to cover just such claims as are now under discussion that the sections of the statute were enacted. I think the result of their enactment was to so place the contractors with reference to the defendant that the character of its liability at any time was to be discovered by reference to the contracts themselves, and that no implied liability arising from the acts or omissions of any person should be suffered to be created in favor of contractors or the defendant compelled to answer in damages for any claims outside of the provisions and in accordance with the terms of the contract.

The plaintiffs refer to the case of *Mulholland* v. *City of New York* (113 N. Y. 631), as furnishing an authority for the recovery of the increased cost of doing the work caused by the negligence of the defendant's agents. We think the case differs materially from that under discussion. We think the general statute, which was applicable in the reported case, differs in effect very greatly from the one under discussion here, so far as regards the question of liability. Again, the action was against the city upon one of those ordinary contracts for the routine work of the city in grading and setting curb and gutter stones and flagging a street in the city, and the wrong grades given made necessary work which was not within the original plan, and which was caused by a deviation from it, and for its accomplishment was, in fact, useless. The error arose from the act of an admitted agent of the city, acting under the authority of his general duties as such agent, while here the alleged neglect arises from an employee of the aqueduct commission acting under this special statute, enacting freedom from liability in the language already quoted and in much plainer and more controlling terms than any statute cited in the *Mulholland* case.

Neither does the case which holds some of the officers of the aqueduct commission to have been city officers, within the meaning of the civil service rules, apply here or furnish any argument in favor of the liability of defendant to the plaintiffs, on account of the acts of the engineers.  I refer to the case of *People ex rel. Ryan* v. *Civil Service Boards* (103 N. Y. 657), affirming on the opinion at the General Term of the Supreme Court the same case reported in 41 Hun, 287–298.

There is some ground in the evidence for claiming that, in fact, the alleged errors of grades, etc., were very trifling in amount, and such as were almost inevitable in the prosecution of a work like this, but I do not place the decision on any such ground.  I assume the errors were radical and harmful. For the reasons stated no recovery can be had against the defendant on the facts proved.

*Third.* There is a cause of action set forth in the complaint which, perhaps, does not come within either of the two divisions into which the counsel for the plaintiffs have divided their claims against the defendant.

It is set forth in the cause of action for the value of the work performed in grouting the tunnel under the direction of the engineers, and I think it cannot be sustained.  The engineers claimed that these orders were given under either the direction of the aqueduct commissioners or on their own account in order to compel a compliance in substance with the terms of the contract.  They asserted that there had been bad if not fraudulent work in the backing of the tunnel, where solid masonry ought to have been placed.  The allegation was that the said masonry had not been placed there, and that it was, in a large degree, nothing but dry filling, while the contractors had been paid for solid masonry.  The contractors denied any fraud, and they gave evidence tending to show that in this particular section there were but two or three insignificant places as to size where any imperfect or bad work had been found, and that this they had voluntarily made good and solid at their own expense.  Nevertheless, over six-

teen thousand barrels of cement and as many of sand were used in this section for the purpose of grouting the places where solid masonry was called for by the contract, and this was done by direction of the commission and engineers, and for the value of these materials furnished and this labor performed the plaintiffs claim the right to recover.

The work was done either in the performance of the requirements of the contract or else it was not. The aqueduct commissioners and the engineers claimed that it was necessary in order to make the work come up to the requirements of the contract. Hence it was done. There is no dispute, and can be none from the evidence, that the work was in reality done, because of this claim on the part of the commissioners, though it was at the same time claimed by the plaintiffs to be wholly unnecessary, and that the contract had been in truth substantially performed by them outside and exclusive of the work.

If the commissioners were right in their claim there can be no question that the plaintiffs could not recover for work made necessary by the default of their own workmen, and which had to be done before the structure could be called complete, even in substantial performance of the contract.

If the commissioners were wrong, then this work was not required by the contract in order to substantially comply with its provisions. It was extra work, or work outside of the contract. The contract provided for extra work, and made it a condition for the foundation of any claim therefor that it must have been authorized in writing by the commissioners before its performance, and a certificate made by them on account of each order, certifying that in their opinion it was for the public interest that such extra work be done, stating in the certificate their reasons therefor. There can be no pretense that this work was, in fact, ordered by the commissioners under this provision of the contract, or that it was regarded by them as extra work, or that it was so certified. Besides that, any extra work ordered which would amount to an expenditure of over $1,000, had, by the statute, to be procured by contract, while any other work done without contract was limited to an amount not exceeding $5,000. (Section 33 of the Aqueduct Act.)

There was but one course for the plaintiffs to have pursued, if they really believed the work had been completed in substantial compliance with their contract. They should have refused to do this work of grouting, and should have gone on with their contract and demanded their final certificate. If refused, they could have waited a reasonable time, and the certificate still being withheld they could have commenced their action and alleged the completion of the work according to the contract and the unreasonable withholding of the certificate, and in that way the question could have been legally determined, and if they were right they would have recovered for their work without doing this alleged unnecessary grouting.

This course was not pursued, and I think the plaintiffs make out no cause of action to recover for the cost of this grouting done under the circumstances stated.

It is apparent from what has been said in the course of this opinion that the plaintiffs have failed to prove facts sufficient to constitute a cause of action against the defendant for any greater sum than is acknowledged to be due in the final certificate. It is not necessary to proceed and enumerate each cause of action set forth in the complaint or upon which evidence was given on the trial.

I have given to the examination of this most important case a large amount of time and have considered its various facts with all the attention possible to devote to them, and after such examination and consideration no one can be more sensible than I am of the inadequacy of the treatment of the whole case. The failure to notice and dwell upon the great number of facts which lie hidden within the covers of this large record, must not, however, be taken as evidence of ignorance of their existence. Acting with all the care and judgment that I have been enabled to give the case, I can see no ground upon which the judgment of the lower court can be disturbed, and it ought, in my opinion, to be affirmed, with costs.

All concur, except EARL, O'BRIEN and MAYNARD, JJ., dissenting.

Judgment affirmed.