THE CITY OF NEW YORK, Respondent, Appellant, v. NATIONAL DREDGING COMPANY, Appellant, Respondent, Impleaded with JAMES J. BROWNE and Others, Defendants.

First Department, June 24, 1938.

*Roger Siddall* of counsel [*Joseph W. Whelan* with him on the brief; *Kirlin, Campbell, Hickox, Keating & McGrann*, attorneys], for the appellant-respondent.

*Milton I. Newman* of counsel [*Paxton Blair* with him on the brief; *William C. Chanler, Corporation Counsel*, attorney], for the respondent-appellant.

UNTERMYER, J.   Under a contract with the city of New York, the defendant National Dredging Company agreed to make a hydraulic fill on an area of marsh land in Brooklyn, known as Marine Park.  The defendant also agreed to strip certain top soil in a part of that area and to remove it to the park nursery, a mile distant.  Specifications for the work together with a map of the proposed fill, bearing the park department number " MP-58," were attached to the contract.

The defendant brought a dredge to the site and commenced work in July, 1931.  Each month the defendant was paid ninety per cent of the estimated amount of work performed, in accordance with the terms of the contract.  After completion of the work in December, 1931, a " Final Certificate of the Completion and Acceptance of the Work " was issued by the city to the defendant. Thereby the city certified that the total quantity of hydraulic fill placed in the contract area was 3,090,269 cubic yards, which at the contract price of $.1385 per cubic yard, amounted to $428,002.26; also that 10,538.4 cubic yards of top soil had been removed which, at the agreed price of $1.25 per cubic yard, amounted to $13,173. Payment of $348,367.50 having previously been certified against the total amount of the contract price of $441,175.26, there remained a balance of $92,807.76.  Upon investigation, the comptroller's office reported that the excess in the amounts stated in the final certificate over the quantities estimated by the city engineers before commencement of the work was due to an increase of work ordered and to the subsidence of the fill.  Apparently the items were deemed satisfactorily completed since final payment was made to the defendant and the defendant executed a general release.

Some time thereafter the city instituted this action to recover an alleged overpayment to the defendant with respect to both items of the work. In the first cause of action it claimed that the defendant was overpaid $26,040.91 for supplying 188,021 cubic yards of fill outside the contract area of work. In the second cause of action it sought to recover $8,548 alleged to have been in excess of the amount specified in the contract for the removal of top soil. On the first item the city recovered judgment for the repayment of $13,946.53 which had been paid to the defendant for excess fill; on the second item it recovered judgment for the full amount demanded. The defendant appeals from the entire judgment; the plaintiff appeals only from so much of the judgment as fails to award to the city an additional $12,094.38 claimed under the first cause of action for the remaining 87,324 cubic yards of excess fill.

The area in which the hydraulic fill was to be placed is shown on the map which has been referred to and which was made a part of the contract. Michalowitz, the plaintiff's engineer, testified that fill had been placed in three areas located outside the limits fixed by the contract, as follows: 86,659 cubic yards in the so-called " playground " area; 64,038 cubic yards in a fifty-foot strip along Gerritsen avenue on the western boundary of the park; and 87,324 cubic yards beyond the southern limit, making a total of 238,021 cubic yards of fill. Since 50,000 cubic yards had been placed in the " playground " area for the account of another contractor, the plaintiff's claim for overpayment was reduced to 188,021 cubic yards.

On its claim for excess fill, the judgment allows the city to recover for overpayment on 100,697 cubic yards. This consists of 36,659 yards in the " playground " area (i. e., the difference between 86,659 cubic yards and the 50,000 cubic yards supplied for another contractor) and the 64,038 cubic yards placed in the fifty-foot area along Gerritsen avenue. Recovery was denied for fill placed in the third area which extended beyond the southern limits of the contract area. It is conceded that the " playground " area and the area at the south are not within the boundaries of the work as originally specified. Whether or not the fifty-foot strip along Gerritsen avenue is within the contract was a controverted issue at the trial.

The contractor engaged by the city to supply the 50,000 cubic yards of fill in the " playground " area arranged to pay the defendant for the performance of this work by filing with the department of finance an assignment to the defendant of $10,000 which sum was eventually paid by the city. Concededly this area was not within the contract boundaries but the defendant maintains that

it never asserted any claim against the city, except as to the $10,000, for supplying fill therein. The court found that 36,659 cubic yards of excess fill had been placed in this area for which, it appears to have assumed, the defendant was paid by the city. We find no adequate proof, however, that the defendant was improperly paid for the 36,659 cubic yards of fill in this area. If this additional quantity was placed in the " playground " area, satisfactory proof was necessary to establish that it was included in the total amount of fill for which the city eventually paid the defendant.

As to the Gerritsen avenue strip, the city contends that this area is not included in the contract because the levee line (a heavy white line) on MP-58 marked the western boundary of the fill. The defendant contends that this strip is included in the contract for the reason that the typical profile section shown on the same map as well as a dotted white line thereon labeled " Approximate Limit of work line " would so indicate. The defendant's contention finds further support in certain paragraphs of the special provisions of the specifications. Paragraph 2 provides that the " work will consist of filling with hydraulic fill that section of Marine Park   *   *   * bounded by   *   *   *   Gerritsen Avenue;   *   *   *   all in accordance with plan # M.P. 58, these specifications, and the instructions of the Engineer of the Park Department." Paragraph 22 also provides: " The street area to be filled adjoining Gerritsen Avenue shall be considered within the limits of work." These facts would tend to show that the fill was to be run over the levee and closed with the bank of Gerritsen avenue. It is unnecessary, however, to decide that question upon the present record on account of a defect in the city's proof which requires a retrial of the issues arising on the first cause of action in the complaint.

The city certified 3,090,269 cubic yards of fill as having been supplied by the defendant within the contract area, and the defendant received payment from the city at the rate of $.1385 per cubic yard. Although these facts would not preclude the city under its contract from recovering for overpayment (*O'Brien* v. *Mayor, etc.*, 139 N. Y. 543), they cast upon it the burden of establishing all the elements necessary to sustain the allegation that an overpayment had been made. One of these elements was that less fill had been placed within the contract area than the city had paid for. That fact was not established by proof that the defendant had placed certain fill beyond the contract area in the absence of proof that such fill had been included in the quantity for which the city had paid. Indeed, if the figures of Randall, the defendant's superintendent, were adopted, they would show that the fill within the

uncontested area was in itself almost equal to the total amount for which the defendant was paid. The defect of proof on these issues requires that we remit them for a new trial.

With respect to the excess fill beyond the southern boundary limit, the city contends that this was not "necessary for the proper completion of the work" under paragraph GG of the contract, which provides:

"(GG) An increase in the amount of work to be performed under any or all items of the contract for which a price or prices have been bid and which is *necessary for the proper completion of the work* shall be deemed work under the contract and shall be performed by the Contractor when so ordered in writing by the Engineer."

It is undisputed that the southern extension was an increase in the amount of the work to be performed. Davy, the city engineer, was given the power under paragraph F of the contract to "determine the amount or the quality of the several kinds of work and materials which are to be paid for under this contract" and "determine all questions in relation to the work or materials and the construction thereof" and "decide every question which may arise relative to the execution of this contract on the part of the Contractor." He testified that in his judgment it was essential that this extension be made in order to obtain a satisfactory result. After the defendant had commenced operations, a condition not contemplated by the contract was discovered in that a water-course was found to lie where the southeast corner of the fill would terminate. Pursuant to the power contained in paragraph F of the contract, Davy ordered the extension to be made. We think there can be no question concerning the necessity of extending the fill to the south in order to close the watercourse and terminate the fill on a sound foundation.

The city also asserts that payment for this extension should not have been allowed because the defendant did not obtain a written order from the engineer before the work was performed. But the contract did not prescribe, as a condition of payment, that such work should have been ordered "in writing" by the engineer. It required the defendant to perform additional work at the contract price only if ordered by the engineer in writing. Consequently, although the defendant might have availed itself of the protection of these provisions by refusing to perform the additional work without a written order, it was under no duty to do so. In any event, after this additional work was done, it was "deemed work under the contract," as the final certificate shows. Under these circumstances, the requirement of a written order was

waived. (*Abells* v. *City of Syracuse*, 7 App. Div. 501.) Accordingly, we agree with the conclusion of the trial justice in rejecting the plaintiff's claim in this respect.

Under the contract for the removal of top soil, the defendant undertook to strip, transport and place the estimated quantity of 3,700 cubic yards at the agreed compensation of $1.25 per cubic yard. By paragraph 26 of the special provisions of the specifications it is provided that "At the location shown on the plan, the contractor, prior to actual starting of filling operations, shall strip the indicated area of the top to approximate depth of fifteen (15) inches." The "indicated area" is shown on the map to be 230 by 345 feet and is marked "Cultivated area top-soil 15″ deep to be stripped and placed in Nursery." Thus was the contract quantity of top soil in the cultivated area calculated at 3,700 cubic yards.

The defendant claims that unforeseen conditions were also encountered in connection with this work and that it thereby became expedient to strip and haul about 6,800 additional cubic yards which otherwise would have been buried by the fill and lost. Soon after the work was commenced, it was reported to Davy, as chief engineer, that there was more top soil in this locality than had originally been estimated. Davy thereupon issued instructions that all good top soil in the locality should be stripped and hauled to the nursery under the contract. It conceded that the excess of top soil was taken from beyond the bounds of the plot originally laid out, and that it was not necessary to strip and haul this additional quantity for the proper removal of the top soil specified in the contract. Nevertheless the defendant contends that in so doing it was conserving the city's natural resources from waste.

The city does not concede that more than 3,700 cubic yards of top soil were removed. However this may be, if more was in fact removed, although at the direction of the engineer, the city was not liable for payment beyond the contract quantity. The defendant contracted to remove 3,700 cubic yards of top soil, and since it was admitted that it was possible to remove precisely that quantity, it cannot be said to have been "necessary" to remove more for the "proper completion of the work," under paragraph GG of the contract. Otherwise, the city's engineer could, by revision, make an entirely new contract for the city whenever in his opinion it seemed to the city's advantage so to do. The present case would illustrate those consequences if a contractor employed to remove 3,700 cubic yards of top soil from an area described by metes and bounds as to length, width, depth and

quantity were permitted to be paid for an excess of, approximately, twice that amount taken from a different area in the same general locality. Accordingly, so much of the judgment as rests upon the plaintiff's second cause of action should be affirmed.

The judgment should be modified by reducing the amount thereof to $8,548, the sum for which recovery was allowed on the second cause of action, with interest thereon from January 26, 1932, and costs; and by directing that the action be severed and a new trial ordered as to the first cause of action; and that as so modified the judgment should be affirmed, without costs of this appeal.

O'MALLEY and GLENNON, JJ., concur; MARTIN, P. J., and TOWNLEY, J., dissent and vote to reverse and dismiss the complaint.

MARTIN, P. J. (dissenting). In June, 1931, the plaintiff, The City of New York, and the defendant National Dredging Company entered into a contract for the filling and reclamation of swamp and marsh land, a part of the park commonly known as Marine Park in Brooklyn. The contract called for the preservation of top soil in an indicated area. The work was commenced in July and completed by December, 1931. A final certificate of the completion and acceptance of the work was issued by the city, and the defendant was paid in full and executed a general release. Four years later this action was commenced to recover an alleged over-payment of $51,282.26 for fill beyond the bounds and limits of the area described in the contract and the sum of $8,548 excess payment in connection with the preservation of the top soil. The basis of the claim in the first cause of action is that the city had paid for more fill than was actually placed in the contract area. In its effort to prove this claim, the city sought to establish that it had paid for fill in three areas located beyond and outside the authorized contract area, which three areas are referred to as (1) the playground area, (2) the " fifty-foot " area along Gerritsen avenue, and (3) the area beyond the southern limit of the contract area.

When due consideration is given to the terms of the contract there appears to be no merit to the city's claim with reference to the area beyond the southern limit of the contract area. This was an extension necessitated by the presence of a watercourse and was authorized by the city engineer in accordance with the provisions of the contract. The Gerritsen avenue strip is included in the contract, as indicated by the map, the typical profile section and provisions of the specifications. If it were not included in the authorized contract area, there would remain an unfinished fifty-foot strip of marsh between the park and the adjacent street. It is urged that this permitted future planning and development and

that it would have been automatically filled by fill blown in by the wind. The strip had to be filled eventually and it is unlikely that this was to be left to chance. While a levee was to be placed fifty feet away from the street, the evidence makes it clear that the fill itself was to be run over the levee and adjacent to the street area and the existing Gerritsen avenue. It is conceded that the playground area is not in the contract area, but it appears that defendant was paid for that under special arrangement with another contractor, and there is no satisfactory proof that any portion of the playground area fill was included in the total for which the city paid the defendant.

The burden was on the city to establish that 3,090,269 cubic yards of fill for which it paid were not placed in the authorized area. Considered in the most favorable light, the evidence offered by the city proved that 188,021 cubic yards of fill were placed in what it calls the unauthorized contract area. This, of itself, does not establish excessive payment by the city. The defendant's superintendent testified to the total amount of fill. His figures show a total which allows for the unquestioned area 23,690 cubic yards less than the amount paid for by the city. This relatively small total is more than offset by the yardage which went into the area beyond the southern limit of the contract area, about which even the trial court had no doubt, and the fill in the Gerritsen avenue strip, which we also hold was properly included in the total for which the city paid.

The second cause of action related to top soil. The specifications provided: " At the location shown on the plan, the contractor, prior to actual starting of filling operations, shall strip the indicated area of the top to approximate depth of fifteen (15) inches. The top soil shall be transported to Park Nursery in Marine Park, an approximate haul of one (1) mile, and deposited in spoil heap at designated locations to the size and area of heaps as designated by the Engineer."

Preliminary to commencement of the work, the indicated area was staked out, so that a plot 230 by 345 feet was marked for removal of the top soil. The top soil was valuable and worth preserving. The contract clearly shows that it was the intention of the city to prevent the loss of all valuable top soil. Soon after the work of removing was commenced, it was discovered that there was much more top soil in the locality than estimated, some of which was beyond the limits of the indicated area. The chief engineer in charge then issued instructions that all the top soil that could be used should be stripped and hauled to the nursery as part of the contract. These instructions were carried out, and

the final certificate indicates that a total of 10,538.4 cubic yards of top soil was removed. On the trial the plaintiff produced no proof that 10,538.4 cubic yards were not, in fact, removed and delivered. It is urged that the contract called for the removal of only 3,700 cubic yards, and that if, in fact, more was removed the city is not liable for payment beyond the contract quantity. The estimate was approximate only, and, under the provisions of paragraph GG of the contract, the engineer was authorized to order the removal of additional top soil. The preservation of any of the top soil was not necessary to the principal object of the contract, to wit, the fill. The fill could have been placed over the top soil, in which event the top soil would have been wasted and destroyed. Obviously, the intention was to conserve all the top soil. While it was originally thought that only about 3,700 cubic yards could be saved, it was found that a total of more than 10,000 cubic yards could be preserved. In the place where the top soil was located it was found that it was much more than fifteen inches in depth.

The engineer acted within his authority when he ordered the extra top soil removed. The city has received the full amount of the top soil for which defendant has been paid. There is no charge of collusion or bad faith between the engineer and the defendant. It may not be said that the conservation of the additional quantity of top soil is so palpably and manifestly beyond the scope of the contract as to relieve the city of the obligation of paying therefor. (*Borough Construction Co.* v. *City of New York*, 200 N. Y. 149.)

Under the so-called non-estoppel clause of the contract, the city is not concluded by the final certificate of completion and acceptance of the work and is not precluded from recovering any overpayment, but the burden is upon it of establishing that an overpayment was, in fact, made. The city has expressly disclaimed any charge of fraud. Upon the trial it was claimed that the amounts certified for payment in the final certificate were arrived at through a misconstruction of the terms of the contract. The making of the final certificate was not alleged or pleaded in the complaint, and no attack upon it was made. The complaint was, therefore, defective. (*Sweet* v. *Morrison*, 116 N. Y. 19.) Testimony that the amounts certified in the final certificate were made under a misconstruction of the provisions of the contract would have been inadmissible even in view of the non-estoppel clause if objection to such testimony had been made. (*Brady* v. *Mayor, etc.*, 132 N. Y. 415, 423, 424.) The plaintiff failed to establish the allegations of its complaint, and a dismissal at the close of the plaintiff's case would have been justified had a motion therefor been made. Apparently the defendant preferred a full and complete disclosure of the facts.

On the entire record we conclude that defendant has received nothing in excess of that to which it was entitled under its contract, and the complaint should be dismissed.

TOWNLEY, J., concurs.

Judgment modified by reducing the amount thereof to $8,548, the sum for which recovery was allowed on the second cause of action, with interest thereon from January 26, 1932, and costs; and by directing that the action be severed and a new trial ordered as to the first cause of action; and as so modified judgment affirmed, without costs of this appeal.   Settle order on notice.